NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 69

No. 2020-232

In re Petition of Apple Hill Solar LLC

Supreme Court

On Appeal from
Public Utility Commission

March Term, 2021

Anthony Z. Roisman, Chair

Thomas Melone, Allco Renewable Energy Limited, New Haven, Connecticut, for Appellant.

Thomas J. Donovan, Jr., Attorney General, and Melanie Kehne, Assistant Attorney General,
 Montpelier, for Appellees Agency of Natural Resources and the State of Vermont.

L. Brooke Dingledine of Valsangiacomo, Detora & McQuesten, P.C., Barre, for Appellees
 Libby Harris and Apple Hill Homeowners Association.


PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.


¶ 1. **ROBINSON, J.** Following a remand from this Court, the Public Utility Commission (PUC) denied petitioner's request for a certificate of public good (CPG) to construct a 2.0 megawatt (MW) solar facility on Apple Hill in the Town of Bennington, Vermont. Petitioner appeals, arguing that the PUC erred in: (1) denying its request to amend its petition; (2) concluding that the Bennington Town Plan and Bennington Regional Plan contained clear community standards and that the project would violate those standards; (3) applying the "modified Quechee" standard in the aesthetics analysis without having gone through rulemaking; (4) treating the provisions of the Bennington Town Plan as if they were binding zoning ordinances in violation of

24 V.S.A. § 4413; (5) failing to consider the positive benefits of the project with respect to greenhouse-gas emissions in the contexts of its aesthetics analysis; and (6) applying vague and standardless tests in violation of its constitutional rights. As discussed below, we reject significant portions of the PUC's rationale for denying petitioner a CPG, and we therefore reverse and remand for additional proceedings.

## I. Prior Proceedings

¶ 2.    This case is before us for a second time. The PUC initially granted petitioner's request for a CPG. Neighbors appealed, challenging the PUC's conclusions that the project would not unduly interfere with the orderly development of the region or have an undue adverse effect on aesthetics. See 30 V.S.A. §§ 248(b)(1), (5) (requiring findings to this effect for issuance of CPG). We reversed and remanded for additional proceedings, holding that the PUC's conclusions on these points were unsupported by its findings and the evidence. See In re Apple Hill Solar LLC (Apple Hill I), 2019 VT 64, ¶ 14, 211 Vt. 54, 219 A.3d 1295.

¶ 3.    More specifically, in concluding that the project would not unduly interfere with the orderly development of the region, the PUC relied heavily on its conclusion that the Town itself took the position that the project would not deviate from the requirements of the Town Plan. Id. ¶¶ 29-30; see also 30 V.S.A. § 248(b)(1) (requiring finding that project would "not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions, the recommendations of the municipal legislative bodies, and the land conservation measures contained in the plan of any affected municipality"). We concluded that the Town had not in fact taken such a position but in fact had repeatedly emphasized that it took no position as to whether the project complied with the Town Plan. Apple Hill I, 2019 VT 64, ¶ 30. For that reason, we concluded that the PUC erred by deferring "to a position the Town did not actually take." Id. We directed the PUC on remand

2

"to assess the impact of the project on the orderly development of the region in light of the Town Plan without consideration of the selectboard's purported position on the subject." Id. ¶ 31.

¶ 4.    With respect to aesthetics under 30 V.S.A. § 248(b)(5), the PUC applied a modified version of the Quechee test to evaluate if a project's adverse aesthetic effect would be undue. Id. ¶ 33. Under this test,

> [a]n adverse effect is not undue if the project will not violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area and will not offend the sensibilities of the average person, and the applicant will take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

Id. (quotations omitted). "Town plans may be sources of clear, written community standards." Id.

¶ 5.    The PUC's conclusion on aesthetics rested in part on a determination that the Bennington Town Plan did not constitute "a clear, written community standard intended to preserve aesthetics." Id. ¶ 32. According to the PUC, the Town treated its plan "like a zoning ordinance . . . subject to varied application" and took different positions on whether "development of commercial solar-generation facilities" was allowed in the Rural Conservation District, where the proposed facility would be located. Id. ¶ 34 (quotation marks omitted). The PUC deemed the Town's decision not to oppose the project a failure to "clearly and consistently apply the language of the Town Plan" and concluded, as a result, that the 2010 Town Plan "no longer serve[d] as a clear, written community standard that unequivocally identif[ied] the Rural Conservation District as a resource that need[ed] protection." Id. (quotation marks omitted).

¶ 6.    We reversed this conclusion because the evidence that the PUC appeared to rely on—the Town's decision not to affirmatively argue that the project violated the Town Plan, the Town attorney's opinion and advice to the selectboard before it made its decision, and the Town Planner's testimony—did not show that the Town inconsistently applied the standards for the Rural Conservation District. Id. ¶ 37. "We accordingly direct[ed] the PUC to determine whether the

3

project violates those standards in assessing whether the project's adverse effects [were] undue." Id. ¶ 36.

¶ 7. We did not address the substance of any purported standards in Apple Hill I. We emphasized that our determination—that the evidence relied upon by the PUC did not support its conclusion that the Town Plan did not "constitute a clear, written community standard intended to protect aesthetics"—was not intended to suggest that the project necessarily violated such a standard. Id. ¶ 41. We held only that the PUC erred in declining to actually apply clear, written standards in the Town Plan in evaluating whether the project's adverse effect would be undue. Id. We added that, in applying this standard on remand, the PUC must also address whether the project violated "the specific design standards in the Rural Conservation District," including that development could not "be sited in prominently visible locations on hillsides or ridgelines, [must] utilize earth tone colors and non-reflective materials on exterior surfaces of all structures, and must minimize clearing of natural vegetation." Id. ¶ 41 n.14 (quotation marks omitted).

## II. Decision on Remand

¶ 8. The parties agreed that no additional evidence was necessary on remand. A hearing officer subsequently recommended that the PUC deny the CPG. He concluded that the facility would unduly interfere with the orderly development of the region because it was inconsistent with the Town and Regional Plans, and that it would have an undue adverse impact on aesthetics and the scenic or natural beauty of the area because it violated clear community standards in the Town Plan.

¶ 9. Several months after this decision—and just before argument in front of the PUC— petitioner attempted to amend its petition over the opposition of the Agency of Natural Resources. The PUC denied petitioner's request to amend, finding that it proposed significant changes and essentially sought review of a new project. It considered the request inappropriate, untimely, and outside the scope of its review on remand.

4

¶ 10.   On the merits of the CPG, the PUC adopted the hearing officer's proposed decision, which reflects the following.  The facility would be built in the Town's Rural Conservation District.  It would abut the site of another proposed facility (Willow Road) on a 27-acre parcel on Apple Hill.  The facility would be topographically sloped from a high elevation of 778 feet at the northeast corner to a low point of 675 feet near the southwest corner.  The overall grade is approximately 10% with a total vertical change of 103 feet over 1028 feet.  The racking system would be painted matte black like the color of the nonreflective solar panels.  The facility would require 9.67 acres of clearcutting.

¶ 11.   During the winter leaf-off conditions, the facility would be visible from various locations, including: the Vermont Welcome Center south of the base of Apple Hill; from the west, to vehicles heading north on heavily traveled U.S. Route 7; from the closest residence to the facility, which was approximately 400 feet to the north-northeast; and from the Mt. Anthony Country Club, which was approximately 6200 feet southwest of the facility.  It would be minimally visible from the observation windows at the Bennington Battle Monument.

¶ 12.   In considering orderly development under 30 V.S.A. § 248(b)(1), the hearing officer looked to the Town and Regional Plans.  The Town Plan defined Rural Conservation Districts as "valley areas outside the urban growth area" that are "set aside to conserve their rural and open space character."  RCDs are intended "to preserve traditional low-density rural and agricultural uses while accommodating low-density residential development in a manner that avoids the need for a public water supply and public sewer systems."  The highway interchange at the junction of U.S. Route 7 and VT Route 279 served as the southwestern corner of the RCD at issue here, and it was surrounded by other types of zoning districts.  The junction served as a boundary between developed urban and industrial areas in the western, central, and southern portions of Bennington, and minimally developed rural and agricultural areas in northeastern Bennington.

¶ 13. The Town Plan allowed development to occur outside the urban growth area but required that it be much less concentrated and not include new commercial uses unless such uses were compatible with the area's rural character. The Plan also contained specific design standards applicable to any new development in the RCDs, including that "[d]evelopment in the area cannot be sited in prominently visible locations on hillsides or ridgelines." The hearing officer concluded that these design standards are specific land-conservation measures contemplated by § 248(b)(1) and specifically applicable to the facility site in this case.

¶ 14. Like the Bennington Town Plan, the Bennington County Regional Plan provided that rural development "should occur as relatively compact and cohesive units that serve to reinforce, rather than replace, the region's rural character," and that "[f]uture development should be concentrated in and around growth centers; that is, the urban centers and villages in the region." The Plan emphasized that "the demarcation between growth centers and the rural environment should be quite distinct." To avoid sprawl and preserve the region's distinctive rural character and appeal, the plan therefore "direct[ed] new growth to urban and village areas and allows the type of development in rural areas that will not prove costly to municipalities nor detract from the region's rural character."

¶ 15. Based on these and other findings, the hearing officer concluded that the proposed facility would unduly interfere with the orderly development of the region. He found that clearing 9.67 acres of existing vegetation in a prominently visible location on a hillside ran directly afoul of the specific design standards in the Town Plan and the orderly development of the region. As viewed from the Vermont Welcome Center, the facility would create a "black box" on the hillside that would "stick out like a sore thumb" on forested Apple Hill. It would appear as further growth along the highway and be visible to local and regional visitors; what they would see would deviate from the Regional Plan, which supported the Town Plan's vision for that well-traveled part of Bennington. It would break down the demarcation between the urban growth area and the RCD

6

and exemplify the sprawling-out of an urban center with the result that the views toward the facility would cause Apple Hill to lose some of its rural character and appeal. The hearing officer found that these facility impacts violated both Plans and would have a regional impact.

¶ 16. The hearing officer considered petitioner's various arguments concerning orderly development. He rejected as counterfactual petitioner's assertion that the facility was not on a hillside and would not be visible. He acknowledged that two smaller solar plants were located in the RCD but found them distinguishable in location, size, and character. Having concluded that the facility would be a commercial development incompatible with the rural character of the area and be sited in a prominently visible location on a hillside, the hearing officer found it unnecessary to address petitioner's arguments that the project would satisfy the remaining design requirements for development within the RCD.

¶ 17. In addition to his conclusions concerning "orderly development," the hearing officer also concluded that the facility would have an undue adverse impact on aesthetics and on the scenic or natural beauty of the area. He found that the Town Plan sought to conserve scenic resources by identifying specific, actionable requirements, and it thus constituted a clear, written community standard under the Quechee test. He relied on many of the same findings discussed above, including the wooded, sloping nature of the project site; the facility's visibility; visual incongruities created by the facility; and the defining characteristics and primary purpose of the RCD where the facility would be located. Consistent with the discussion of the Town Plan language as a land-conservation measure under § 248(b)(1), he concluded that the facility violated this clear, written community standard.

¶ 18. More specifically, the hearing officer identified the following requirements for development in the RCD: (1) development shall not include new commercial uses unless such uses are compatible with the rural character of the area; (2) no development may be sited in prominently visible locations on hillsides or ridgelines; (3) any development must utilize earth-tone colors and

7

nonreflective materials on exterior surfaces of all structures; and (4) any development must minimize the clearing of natural vegetation.

¶ 19. He found that the facility violated the first two requirements. It proposed a new commercial use that was not compatible with the rural character of the area. It would be a further extension of the industrial growth of the Town beyond the urban growth area and it would appear as such. The 9.67 acres of clearcutting for the facility would be visible from various public and private views and it would look significantly out of context with the currently wooded view of Apple Hill and the less-developed RCD behind it. While petitioner had developed an extensive visual-screening plan, the hearing officer found that the facility would nonetheless remain prominently visible on a hillside above the Vermont Welcome Center.

¶ 20. In its decision, the PUC considered and rejected petitioner's arguments concerning the hearing officer's recommendations. Many of these arguments mirror petitioner's claims on appeal, and we discuss these arguments in greater detail below. Having determined that the project would not serve the public good, the PUC denied petitioner's request for a CPG. Petitioner moved for reconsideration, which the PUC denied, and this appeal followed.

III. Issues on Appeal

¶ 21. On appeal, petitioner argues that the PUC erred in: denying its request to amend the petition; concluding that the project violates clear community standards; improperly applying a "modified Quechee" standard in the aesthetics analysis without having gone through rulemaking; treating the provisions of the Bennington Town Plan as if they were binding zoning ordinances in violation of 24 V.S.A. § 4413; failing to consider the positive benefits of the project with respect to greenhouse-gas emissions in the context of its aesthetics analysis; and applying vague and standardless tests in violation of its constitutional rights.

8

¶ 22. In reviewing these challenges, "we give great deference to [the PUC's] expertise and judgment and accord a strong presumption of validity to [its] orders."[1] In re Vt. Elec. Power Co., 2006 VT 69, ¶ 6, 179 Vt. 370, 895 A.2d 226 (quotations omitted). "We will affirm the PUC's findings unless they are clearly erroneous and its legal conclusions if they are rationally derived from a correct interpretation of the law and supported by the findings." Apple Hill I, 2019 VT 64, ¶ 27 (quotation omitted). "[I]t is for the [PUC], not this Court, to weigh the evidence and assess the credibility of witnesses." In re Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 29, 202 Vt. 59, 147 A.3d 621 (quotation omitted).

## A. Request to Amend

¶ 23. Petitioner first argues that the PUC erred in denying its motion to amend. As referenced above, petitioner filed notice that it was amending its petition several months after the hearing officer issued his recommendation on petitioner's existing CPG petition (which was originally filed in March 2015). Petitioner stated that it would be using the lot on which the facility would be located as well as an adjoining lot for agricultural use, and it proposed to clear the lots immediately for such use. It also stated that it would be creating a sheep farm with 50 to 100 sheep and would construct shelters for the sheep and storage for hemp operations on the project site. Petitioner sought to modify various aspects of the proposed facility to accommodate the agricultural and sheep operations, including relocating the solar array and making various aesthetic-related changes to the colors used in the solar project. It also proposed to paint the sheep houses in vivid colors to "distract from any potential view of the [solar] project."

¶ 24. The PUC denied petitioner's amendment request, finding that petitioner improperly sought review of questions outside this Court's limited remand order and that its request was

---

[1] "Prior to July 1, 2017, the Public Utility Commission was known as the Public Service Board." In re Chelsea Solar LLC, 2021 VT 27, ¶ 9 n.2, __ Vt. __, 254 A.3d 156 (quotation omitted). "We use PUC throughout this decision for consistency, even when referring to decisions before July 1, 2017." Id.

untimely. It explained that petitioner proposed changes which would significantly alter the existing project, despite petitioner's earlier acceptance of the limited scope of the remand order, and it now asked the PUC to review a different project with new exhibits which post-dated the earlier final order and remand. It declined to reopen the original petition and hear new evidence.

¶ 25. The PUC explained that its rule allowing amendments "at any time" was subject to jurisdictional and practical limitations, which applied here to prevent absurd results. Petitioner's interpretation of the rule would allow petitions to be amended after each denial, affording proposals a potentially infinite lifespan. The PUC emphasized that new projects must be filed as new projects. The PUC noted that petitioner's motion to amend was also insufficient because petitioner's proposed activities "present[ed] a threat of substantial harm to very rare and rare plants," which petitioner failed to address in its amendment request. It thus denied petitioner's request to amend without prejudice to the filing of a new petition subject to current law.

¶ 26. Petitioner argues on appeal that it is entitled under PUC Rule 2.204(G) to file an amendment "at any time." It further maintains that the PUC was not limited by this Court's remand order but instead was "free to decide anything not foreclosed by the mandate," Hall v. City of Los Angeles, 697 F.3d 1059, 1067 (9th Cir. 2012). Petitioner identifies various issues that it believes were not foreclosed by the mandate here.

¶ 27. Assuming without deciding that the PUC's jurisdiction on remand would have allowed it to grant petitioner's request to amend, we conclude that the PUC acted within its discretion in denying the request to amend the petition pursuant to its authority under the rules.

¶ 28. Rule 2.204(G)(1) provides in relevant part:

> Proposed amendments to any filing may be made at any time. If unobjected to by any party within ten days of filing or at the commencement of any hearing in which the amended matter is at issue, whichever is earlier, such amendment shall be deemed effective, except that the Commission may at any time dismiss any proposed amendments which it finds to have the effect of unreasonably delaying any proceeding or unreasonably adversely

affecting the rights of any party. Where objection is made, amendments shall not be allowed unless the Commission finds . . . that they will not unreasonably delay any proceeding or unreasonably adversely affect the rights of any party . . . .

https://puc.vermont.gov/sites/psbnew/files/doc_library/Commission%20Rule%202.200%20%28

9-15-18%29%20Adopted%20CLEAN.pdf [https://perma.cc/K4ET-TQ8D].

¶ 29.    The Agency of Natural Resources objected to the proposed amendment, and the PUC did not make the positive finding required under the rule. To the contrary, the PUC found that the proposed amendment would significantly change the proposal and that petitioner was essentially seeking review of a new project. It found the request untimely and inappropriate. The PUC plainly had authority under its rules to deny the requested amendment—that is the default position under the rule where an amendment is objected to—and it provided reasonable grounds for its decision. We find no error.

## B.  Clear Community Standards

¶ 30.    Petitioner next argues that the standards in the Town Plan that were central to the PUC's analysis are not the kind of clear local development standards that can be relied upon to deny a certificate of public good under § 248, and, even if they were, the evidence did not support the PUC's conclusion that the Apple Hill project would run afoul of those standards.[2]  These arguments tie into two different aspects of the § 248 analysis and focus on two different provisions in the Town Plan.[3]  Below, we consider whether each of the two relevant provisions constitutes a

---

[2]  Petitioner also challenges the PUC's observation that we implied in our remand order that the specific design standards in the Town Plan were clear, written community standards. As petitioner acknowledges, the PUC found it unnecessary to rely on such implication because it agreed with the hearing officer that the standards were in fact clear, written community standards. We accordingly decline to address petitioner's argument on this point.

[3]  Petitioner filed its CPG petition in March 2015, and we apply the substantive law in effect at that time. As the PUC explained, changes made to 30 V.S.A. § 248 after the petition was filed are "not applicable to this case and [were] not assessed as part of the review of this case."

11

sufficiently clear standard to support the denial of a permit, and whether the evidence was sufficient to support the PUC's conclusion.

¶ 31. Local land-use standards as reflected in the Town Plan potentially impact the analysis in this case in two different ways. Before granting a certificate of public good under § 248, the PUC must find that the project "will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions, the recommendations of the municipal legislative bodies, and the land conservation measures contained in the plan of any affected municipality." 30 V.S.A. § 248(b)(1). In contrast to the Act 250 permitting context, where compliance with duly adopted local or regional plans is a prerequisite to an Act 250 permit, see 10 V.S.A. § 6086(a)(10), for purposes of § 248 review, land-conservation measures in municipal plans are entitled only to "due consideration." 30 V.S.A. § 248(b)(1). As a consequence, even a clear, written land-conservation measure in a municipal land-use plan does not present an insurmountable obstacle to approval of a certificate of public good under § 248.

¶ 32. In addition, to grant petitioner a CPG in this case, the PUC must find that the project "will not have an undue adverse effect on aesthetics, historic sites, air and water purity, the natural environment, the use of natural resources, and the public health and safety, with due consideration having been given" to various specified statutory criteria. Id. § 248(b)(5). An adverse effect on aesthetics is not undue under § 248(b)(5) if the project will "not violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area," will "not offend the sensibilities of the average person," and the applicant will "take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its

12

surroundings." Apple Hill I, 2019 VT 64, ¶ 33 (quotations omitted).[4] For purposes of the first prong of this test, "[t]own plans may be sources of clear, written community standards." Id.

¶ 33.    This test derives from Act 250 case law but has been modified to fit the circumstances of § 248 review. Id. (describing "modified" version of Quechee test from Act 250 cases). In contrast to the Act 250 context, § 248 review supplants rather than supplements local zoning regulation. Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 18. Accordingly, in the § 248 context, a standard that might otherwise constitute a "clear, written, community standard" cannot override the PUC's discretion. Id. ¶¶ 17-18. Rather, the PUC retains the final policy decision and may approve a project even if it violates a clear, written, community standard. Id. ¶ 18.

¶ 34.    In this case, the PUC relied primarily on two provisions in the Town Plan relating to the Rural Conservation District, where the proposed project was to be located. First, with respect to the RCD, the Town Plan explains, "The purpose of the Rural Conservation Districts is to preserve this distinctive rural character while accommodating low density residential development . . . . Agriculture, forestry, very low density single-family residential development, and certain limited uses that are suitable in rural areas are permitted in the district." The PUC concluded that these and other provisions embodied a standard that the Rural Conservation District "shall not include new commercial uses unless such uses are compatible with the rural character of the area." Second, the Town Plan contains specific design standards for new development in the Rural Conservation District: "Development . . . cannot be sited in prominently visible locations

---

[4] "The [Quechee] test first asks whether the project will have an adverse effect on the aesthetics of the area," and only if there is an adverse effect does the PUC consider if the effect is undue. Apple Hill I, 2019 VT 64, ¶ 33. The PUC concluded in its first order that the project would have an adverse aesthetic effect. We directed the PUC on remand to assess if the adverse aesthetic effect was undue. See id. ¶ 41 (directing PUC to "apply the standard in the Town Plan in evaluating whether the project's adverse effect would be undue"). For that reason, in this appeal, we focus only on the "undue" adverse impact analysis.

13

on hillsides or ridgelines, shall utilize earth tone colors and non-reflective materials on exterior surfaces of all structures, and must minimize clearing of natural vegetation."

¶ 35. The first of these design standards—prohibiting prominently visible development on hillsides and ridgelines—played a significant role in the PUC's analysis. The PUC's analysis of the Regional Plan was more sparse, but it relied on statements in the Regional Plan favoring future development in and around urban centers and villages and calling for distinct demarcation between growth centers and the rural environment. Following this guidance in the Town and Regional Plans, the PUC concluded that the project would violate clear, written community standards, and thus unduly interfere with the orderly development of the region and would have an undue adverse impact, because the project would be incompatible with the rural character of the area and prominently visible on the hillside. With respect to each of these two considerations, we consider whether the standard is sufficiently clear, and whether the PUC's findings and conclusions were supported by the evidence.

1. No Development Incompatible with Rural Character of the Area

¶ 36. We conclude that the PUC erred in relying on its conclusion that the project would violate a clear, written standard in the Town Plan and Regional Plan favoring development consistent with the rural character of the Rural Conservation District because the broad and general statements in the Town and Regional Plans are not sufficiently specific to constitute a basis for denying a permit under § 248. We consider the legal significance of the provision calling for development consistent with the rural character of the Rural Conservation District for purposes of the aesthetics analysis and the orderly development analysis, respectively.

a. 30 V.S.A. § 248(b)(5) (Aesthetics)

¶ 37. Our case law supports the conclusion that indications in the Town and Regional Plans that development in the Rural Conservation District or outside of the urban center should be

14

compatible with the area's rural character are not clear, written community standards such that violation renders the project's adverse impact undue under § 248(b)(5).

¶ 38.    In determining whether a project's adverse impact would be undue, the PUC should consider whether it would violate a clear, written community standard. See Apple Hill I, 2019 VT 64, ¶¶ 32–41 (reviewing PUC's conclusions regarding whether Town Plan was source of clear, written standards). In In re UPC Vermont Wind, LLC, we considered whether broad language concerning preservation of the rural character of an area constitutes the kind of clear, written community standard that renders an adverse aesthetic impact undue under § 248(b)(5). 2009 VT 19, ¶¶ 37-38, 185 Vt. 296, 969 A.2d 144. In appealing the PUC's grant of a certificate of public good under § 248 for the construction of a wind-generation facility, opponents of the project pointed to language in the regional plan identifying the area surrounding the proposed project as a " 'rural area' where there should be 'very little commercial or industrial development, unless it occurred in an established industrial park, in an area specifically designated in the local zoning bylaw.' " Id. ¶ 25 (alteration omitted). They also cited provisions providing that development in the area should be compatible with existing land uses and development patterns. Id.

¶ 39.    On appeal, we concluded that the cited provisions of the regional plan did not constitute a clear, written community standard:

> The [PUC] properly concluded that the provisions of the regional plan identified by the Town of Sutton were not sufficiently specific to constitute a clear written community standard that would prohibit the development at issue here.
>
> As the [PUC] explained, to satisfy this standard, a provision must be "intended to preserve the aesthetics or scenic beauty of the area" where the proposed project is located and must apply to specific resources in the proposed project area. The plan here did not identify any particular scenic area for preservation that would be affected by the project. Instead, it recommended that there be limited development in the "rural area" districts that made up large portions of the Northeast Kingdom, and stated that development "should be" compatible with existing land use. Unlike the provisions at issue in the Environmental Board cases upon which

15

> [the appellant] relies, these general statements of preferred, rather than mandated, objectives are far too open-ended to constitute a clear, community written standard that would put UPC on notice that its project was prohibited.

Id. ¶¶ 37-38; cf. In re Woodstock Cmty. Tr. & Hous. Vt. PRD, 2012 VT 87, ¶¶ 32-33, 192 Vt. 474, 60 A.3d 686 (holding in context of Act 250 proceeding that language in town plan emphasizing the prime importance to quality of life and character of town of its "open fields and meadows, . . . wooded hillsides, forests, stream corridors and other natural vistas" did not constitute clear, written community standard for purposes of undue-adverse-impact analysis).

¶ 40. In a related but distinct context, we evaluated the clarity of language in a town plan that was almost identical to the language relied upon by the PUC in this case. In re Chaves Act 250 Permit Reconsider, 2014 VT 5, 195 Vt. 467, 93 A.3d 69, clarified on other grounds by In re B&M Realty, LLC, 2016 VT 114, ¶ 31 n.2, 203 Vt. 438, 158 A.3d 754 ("We clarify here that we review without deference the environmental court's interpretation of the terms of a regional plan as well as its legal conclusion that a project does or does not conform to a regional plan."). In Chaves, neighbors who appealed the award of an Act 250 permit for a sand-and-gravel quarry argued that the project violated a provision in the town plan describing the purpose of the district where the project would be located as to "provide for agriculture, forestry, low-density residential development and other compatible land uses in a manner that maintains the Town's rural character, scenic landscape and natural resources." Id. ¶ 40. We affirmed the Environmental Division's conclusion that the language did not create a specific policy prohibiting the project for purposes of 10 V.S.A. § 6086(a)(1). Id. ¶ 41. We explained, "The language relied on by neighbors is broad and nonregulatory, espousing general policies about maintaining features, protecting valuable areas, and minimizing impacts, but contains no specific requirements that are legally enforceable." Id. We also noted that the town plan expressed other general aspirations which would favor the proposed development. Id. ¶ 42. Though the context of our observation was different—we were

16

applying a factor in an Act 250 case which does not have an exact counterpart under § 248—our description of the breadth and generality of this language applies equally well in this context.

¶ 41.   We recognize that Act 250 and § 248 involve distinct regulatory regimes, and, as neighbors argue, tests imported from Act 250 may apply differently in the § 248 context.  For that reason, we have modified the Quechee test in the context of § 248 proceedings so that local standards that might otherwise appear to be clear, written community standards cannot operate to preclude a certificate of public good under § 248 for a solar development project.  Rutland Renewable Energy, LLC, 2016 VT 50, ¶¶ 17-18.  But the differences between the regimes do not support the very different conclusion that broad, aspirational language in a town plan that would not constitute a clear, written community standard for Act 250 purposes can operate as if it were a clear, written community standard for purposes of precluding a permit under § 248.  Our endorsement in Rutland Renewable Energy, LLC of the distinction between the application of the Quechee test in the context of Act 250 versus § 248 reflected an acknowledgment of the primacy of PUC discretion over municipal requirements in the context of § 248 permitting.  It does not support treating broad and general language in a municipal plan as a clear, written community standard.

¶ 42.   Because we conclude that the general language about preserving the rural character of the entire Rural Conservation District is not the kind of specific, clear, written standard that can render an adverse impact undue under § 248(b)(1), we need not address petitioner's challenge to the PUC's assessment of the evidence relative to this factor, nor petitioner's challenge to the PUC's suggestion that a solar-generation facility is incompatible with rural surroundings.

b.  30 V.S.A. § 248(b)(1) (Orderly Development)

¶ 43.   As noted above, provisions in the town and regional plans may be relevant to the "orderly development" analysis if they contain "land conservation measures."   30 V.S.A. § 248(b)(1).  For the same reasons that the general goal of protecting the rural character of land in

the Rural Conservation District is not a clear, written community standard for purposes of the undue-adverse-impact analysis, it does not qualify as a "land conservation measure"—a phrase that suggests more than a general statement of principles. Cf. In re Acorn Energy Solar 2, LLC, 2021 VT 3, ¶ 92, __ Vt. __, 251 A.3d 899 (noting that "in making the orderly development finding, [the PUC] must only consider compliance with town plans to the extent they qualify as land conservation measures . . . ."). For the above reasons, we conclude that the PUC erred in concluding that the project would interfere with the orderly development of the region and cause undue adverse impact on the ground that is incompatible with the rural character of the area where it is sited.

2. No Development Sited in Prominently Visible Locations on Hillsides

¶ 44.    The second pertinent standard relied upon by the PUC in its aesthetics and orderly development analysis is the design standard providing that "development . . . cannot be sited in prominently visible locations on hillsides."

¶ 45.    In contrast to the broad and general language relating to the preservation of the rural character of the project's surroundings, this design standard has the kind of specificity that qualifies as a clear, written community standard for purposes of the aesthetics analysis, and it amounts to a land-conservation measure for purposes of the orderly development analysis. We reject petitioner's argument that the absence of a more precise definition of "hillside" and "prominently visible" render the requirements impermissibly vague. We are not persuaded otherwise by the Act 250 cases cited by petitioner. See, e.g., In re Kisiel, 172 Vt. 124, 130, 772 A.2d 135, 139-40 (2000) (concluding in context of Act 250 permitting proceeding that in face of debate as to whether proposed project on slopes ranging between 5-20% would constitute development on "steep" slopes, the town plan goal of preventing development on "steep slopes" was a "nonregulatory abstraction"); In re Green Peak Estates, 154 Vt. 363, 367, 369, 577 A.2d 676, 678-79 (1990) (similarly considering Criterion 10 of Act 250, and affirming finding that

18

project would not conform to regional plan because it would violate "specific policy" prohibiting "residential development on slopes exceeding twenty percent").

¶ 46.    In <u>Kisiel</u>, the Court wrestled with a provision in a town plan that defined—with reference to gradients—slight, moderate, severe, and extreme slopes, and provided that "steep slopes and hillsides" are generally unsuitable for development.  172 Vt. at 130, 772 A.2d at 139. Without any indication in the town plan or town ordinances as to what degree of slope qualified as "steep," we concluded that there was no objective measure to guide enforcement of the steep-slope prohibition, and there was no basis for the Board to conclude that the project was not in compliance with the policy.  <u>Id</u>.  By contrast, in this case, the applicable design precludes development on hillsides that is "prominently visible."  This descriptor establishes a specific, actionable requirement and it is not contradicted by other goals.

¶ 47.    The more difficult question is whether the evidence supports the PUC's conclusion that the project would be prominently visible on the hillside.  The PUC found that the clearcutting required for the project would be visible from various views and would be significantly out of context with the currently wooded view of Apple Hill and the less-developed RCD beyond it.  The PUC determined that the whole ten-acre facility on the currently forested Apple Hill, including both the fence and the solar panels, would be sited in a prominently visible location on a hillside above the Vermont Welcome Center.  It found that a portion of the facility would be visible from the Bennington Battle Monument and the whole facility would be prominently visible from the golf course.

¶ 48.    The PUC found that petitioner's own exhibits rebutted its claim that its project would not undermine or degrade the visual quality of the "clear scenic" broader landscape. Petitioner's aesthetics consultant concluded that "the unique form and visual qualities of the facility relative to the existing conditions and topography would create visual incongruities." With respect to petitioner's argument that the project would not be on a hillside, the PUC found that

19

petitioner's own aesthetics consultant acknowledged that there was a moderate slope of approximately 9-to-15% at the site.

¶ 49. In its decision on reconsideration, the PUC also rejected petitioner's reliance on a 2008 photograph of the view of the project site from the golf club, the same photograph petitioner cites in this appeal, to assert that the facility could not be seen from that location. The PUC observed that, even after being criticized by the intervenors for failing to do so, petitioner did not file a simulation supporting its argument that the facility would not be visible from the golf club, as it did for other views. The PUC explained that the photograph, which had a red arrow pointing to the hillside, did not show ten acres of clearcutting and installation of a solar facility. The PUC was unpersuaded that, if ten acres of trees were removed from the spot where the red arrow met Apple Hill in the photo, and a solar facility was installed in its place, the facility would not be visible to a viewer with the naked eye. It reiterated that the proposed facility would cut a ten-acre hole into the wooded hillside and install nearly ten acres of solar panels, significantly modifying the conserved, rural character of the area and violating the town and regional plans.

¶ 50. The PUC's findings are supported by the evidence, and the findings support its conclusion that the facility would be "sited in a prominently visible location on a hillside" in violation of a clear, written community standard and in violation of a land-conservation measure in the Town Plan. Petitioner's evidence and simulations support the PUC's findings on this point, including the visibility of the project, on a hillside, during winter leaf-off conditions from various vantage points, including from the heavily traveled Route 7 and from the Vermont Welcome Center. This alone is sufficient to show that the project would violate the standard in the Town Plan: it would be sited in a prominently visible location on a hillside. It is on the front of the hillside facing the highway, and it is visible from multiple vantage points, including the Vermont Welcome Center.

¶ 51. A photograph of the view from the golf club, introduced by intervenors, also supports the finding that the facility would be visible from the golf course, as does the prefiled testimony of Joseph Schoenig and the report he submitted. Mr. Schoenig is a resident of Apple Hill; he previously worked as a project engineer and project manager as well as the owner and president of a construction company. He reviewed the materials submitted in this case and took photographs of the proposed project area over several years, in all four seasons, from various vantage points. He also created scaled drawings to better depict the project's visibility, stating that they provided more realistic views than the simulations offered by petitioner. Based on his drawings, he stated that petitioner's attempts to screen the facility would be ineffective. He also testified that the project was on a hill. He concluded that the project would be visible based on petitioner's evidence, and he explained that he had also taken photographs of other views that were not submitted by petitioner, including various views from neighboring property. He testified that if the trees on the project site were removed, the project would be clearly visible from neighboring property. He also discussed the possibility of glare from the solar panels being visible from the golf club, notwithstanding the club's distance from the project, citing the glare from another solar project in support of this position. Mr. Schoenig stated that, even if petitioner could screen the panels from neighboring property, it would plainly be visible from various sites in Bennington and it would be inconsistent with the landscape expected by visitors and residents as they passed through the area. The PUC cited Mr. Schoenig's testimony in support of its decision.

¶ 52. We reject petitioner's assertion that the PUC was limited to assessing the project's visibility from "the base of the hill looking up"; the citations it provides to the Town Plan do not support this contention. In fact, our case law is to the contrary. See Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 20 ("In determining whether there has been an undue adverse impact, considering the sensibilities of the average person, the [PUC] can and should consider all vantage points, including from private property."). We note, in any event, that the hearing officer found

21

that the project <u>was</u> similar to one of the examples set forth in the Town Plan in that both showed facilities that "significantly impact the natural appeal of the hillside view."

¶ 53. Petitioner raises numerous additional arguments that essentially challenge the PUC's evaluation of the weight of the evidence. In arguing that the project would not be visible from the neighbor's properties or the Vermont Welcome Center, petitioner relies on evidence rejected by the PUC. Petitioner's assertion that the facility cannot be seen except by a drone is at odds with the PUC's findings and the evidence discussed above. And though petitioner challenges the PUC's description of the project as creating a "black box" on the hillside, we conclude based upon our review of the evidence that that description is not clearly erroneous. We defer to the PUC as factfinder, and we do not reweigh the evidence on appeal. Based on the evidence and its findings, the PUC acted within its discretion in determining that the project would have an undue adverse aesthetic effect under 30 V.S.A. § 230(b)(5). See <u>In re Denio</u>, 158 Vt. 230, 239, 608 A.2d 1166, 1171 (1992) ("Determining the degree of adverse aesthetic effect is a matter of weighing of the evidence, a role for the [PUC] rather than for this Court."), <u>cited in</u> <u>In re Cross Pollination</u>, 2012 VT 29, ¶ 13, 191 Vt. 631, 47 A.3d 1285 (mem.).

C.      The Modified <u>Quechee</u> Test and the Vermont Administrative Procedure Act

¶ 54. Petitioner asserts that the PUC cannot use the <u>Quechee</u> test in the context of its aesthetics analysis because it has not adopted it as a rule under the Vermont Administrative Procedure Act (VAPA). See 3 V.S.A. § 863. Petitioner contends that the test is an "agency statement of general applicability which implements, interprets, or prescribes law or policy," <u>In re</u> <u>Woodford Packers, Inc.</u>, 2003 VT 60, ¶ 15, 175 Vt. 579, 830 A.2d 100 (mem.) (quotation omitted), and that the PUC must engage in rulemaking before applying it.

¶ 55. In rejecting this argument, the PUC explained that it was imbued by statute with "the powers of a court of record," and that this Court had long recognized its authority to serve as a quasi-judicial body. See 30 V.S.A. § 9 (providing that PUC has "the powers of a court of record

in the determination and adjudication of all matters over which it is given jurisdiction" and "may render judgments, make orders and decrees, and enforce the same by any suitable process issuable by courts in this State"). When acting in a quasi-judicial capacity, it was required to follow the substantive standards set forth by statute and the procedural requirements set forth in its procedural rules. It could rely upon its own precedent in interpreting statutes. The PUC explained that, when an administrative agency sits in its quasi-judicial capacity, it renders decisions as a court would with an accompanying legal analysis, which differs from rulemaking.

¶ 56. We agree with the PUC's analysis. We have repeatedly "approved the use of the Quechee test by the [PUC] in reviewing a permit for a CPG," Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 14, including in the instant case, see Apple Hill I, 2019 VT 64, ¶ 41 (directing PUC to "apply the standard in the Town Plan in evaluating whether the project's adverse effect would be undue"). The PUC has quasi-judicial powers, and like a court, it can develop law, tests, and rules through its decisions. See In re SolarCity Corp., 2019 VT 23, ¶¶ 11-13, 210 Vt. 51, 210 A.3d 1255 (recognizing PUC as an "administrative agency that possesses quasi-judicial powers" and describing PUC's powers); see also 1 C. Koch, Jr. & R. Murphy, Admin. Law & Prac. § 2:11 (3d ed. 2020) (recognizing that "[a]djudication is a determination of individual rights or duties," and "adjudication may make 'rules,' . . . in the same way courts make rules in deciding individual cases"). We expect the PUC to issue rulings in contested cases which will be applied consistently in other cases. It makes sense to rely on the Quechee test given the similarities between the statutory aesthetic requirements in 30 V.S.A. § 248(b)(5) and 10 V.S.A. § 6086(a)(8). The PUC's use of the Quechee test was an appropriate exercise of its quasi-judicial authority in ruling on a CPG petition, and it was not required to engage in rulemaking before applying this test.

### D. Statutory Limitations on Effect of Municipal Bylaws

¶ 57. Petitioner next argues that the test for undue adverse aesthetic impact, as applied to its facility, violates 24 V.S.A. § 4413(b) and § 4413(g)(2). These statutes prohibit municipalities

from enacting bylaws that "regulate public utility power generating plants and transmission facilities regulated under 30 V.S.A. § 248," 24 V.S.A. § 4413(b) (2020)[5], or that "[p]rohibit or have the effect of prohibiting the installation of solar collectors . . . , clotheslines, or other energy devices based on renewable resources," id. § 4413(g)(2). Petitioner contends that by considering the Town Plan, the PUC engaged in "an end-run around the prohibition under 24 V.S.A. § 4413(b)." It further asserts that, by recognizing that the Town Plan imposed restrictions on the development of new commercial uses in the RCD, the PUC applied a municipal enactment to prohibit a solar project in violation of 24 V.S.A. § 4413(g)(2).

¶ 58.   As previously noted, municipalities play an advisory rather than controlling role in the § 248 process. See City of S. Burlington v. Vt. Elec. Power Co., 133 Vt. 438, 447-48, 344 A.2d 19, 24-25 (1975) (recognizing that municipalities' role in § 248 matters is advisory, not controlling, and holding that power company was "not required to secure a zoning permit from the City of South Burlington for the facilities covered by the certificate of public good issued under 30 V.S.A. § 248," explaining that law did not give "single municipalities the power to subvert utility projects statewide in scope and broadly entrusted to a single planning and supervisory agency"). Although municipalities cannot, by municipal zoning ordinance, prohibit the siting of solar facilities within the municipality, and the PUC is not compelled to decline to permit a project that runs afoul of clear, written standards, by law, the PUC must give "due consideration" to municipal pronouncements in assessing orderly development, and it properly considers any "clear written community standards" discernable in town plans in assessing whether a project will have an undue adverse effect on aesthetics. Its review under § 248 is entirely consistent with 24 V.S.A. §§ 4413(b) and 4413(g)(2). The PUC did not apply a local zoning ordinance or allow a local

---

[5] This provision was amended effective July 1, 2021, to read: "A bylaw under this chapter shall not regulate electric generation facilities, energy storage facilities, and transmission facilities regulated under 30 V.S.A. § 248 or subject to regulation under 30 V.S.A. § 8011." This change has no effect on our decision.

24

zoning board or bylaw to regulating the siting of the project here; the Town does not have, and the PUC did not apply, a prohibition on solar facilities within the RCD. The PUC made "the final policy decision," Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 18, as directed by the Legislature and provided by the statutory scheme.

### E. Greenhouse-Gas Impacts

¶ 59. Petitioner argues that the PUC erred by failing to consider the project's greenhouse-gas impacts in evaluating whether the project would have an undue adverse aesthetic effect. According to petitioner, this was arbitrary and capricious, ignores § 248(b)(5), and is clearly erroneous. It maintains that, under § 248(b)(5), positive greenhouse-gas benefits can override any undue adverse aesthetic effect.

¶ 60. In rejecting this argument, the PUC explained that it decided the issue of greenhouse-gas impacts in its initial order. As required by 30 V.S.A. § 248(b)(5), it determined that the proposed facility would not result in undue greenhouse-gas emissions, having given due consideration to the criterion specified in 10 V.S.A. § 6086(a)(1) (requiring finding that in Act 250 cases that subdivision or development "[w]ill not result in undue water or air pollution"). It noted that this issue was not remanded for further review. The PUC also found this question immaterial because an analysis of greenhouse-gas impacts would not affect the criteria that the facility failed to meet here.

¶ 61. Assuming without deciding that reviewing the greenhouse impacts was within the scope of the PUC's authority on remand, we agree with the PUC that the statute does not call for the PUC to balance the beneficial greenhouse-gas impacts of a project against other factors in determining if a project's adverse aesthetic effect would be undue.

¶ 62. Section 248(b)(5) requires a finding that a proposed facility:

> will not have an undue adverse effect on aesthetics, historic sites, air and water purity, the natural environment, the use of natural resources, and the public health and safety, with due consideration

25

having been given to the criteria specified in 10 V.S.A. §§ 1424a(d) and 6086(a)(1) through (8) and (9)(K), impacts to primary agricultural soils as defined in 10 V.S.A. § 6001, and greenhouse gas impacts.

¶ 63. The assessment of the project's beneficial greenhouse-gas impacts is distinct from an analysis of its undue adverse effect on aesthetics, both as a matter of common sense and statutory text. The statutory text identifies a list of categories with respect to which the proposed facility must not have an undue adverse impact—"aesthetics, historic sites, air and water purity, the natural environment, the use of natural resources, and the public health and safety." 30 V.S.A. § 248(b)(5). And it identifies a list of criteria warranting "due consideration" in that analysis—the criteria listed in various identified statutes, impacts to primary agricultural soils, and greenhouse-gas impacts. Id.

¶ 64. Even assuming based on the structure of the statute that the "due consideration" criteria are considerations that fold into and underlie the various "undue adverse impact" findings, not every "due consideration" criterion is relevant to every "undue adverse impact" category.[6] For example, a project's "impacts to primary agricultural soils" has little to do with the category of "public health and safety." Likewise, a project's impact on greenhouse gas emissions is not a logical component of an aesthetics analysis. The PUC properly applied the Quechee test to determine the project's aesthetic impacts, separate and apart from its consideration of the project's greenhouse-gas impacts.

---

[6] As a practical matter, the PUC has often considered these "due consideration" criteria as freestanding considerations rather than components of the respective "undue adverse impact" (or "no undue adverse impact") findings. See, e.g., In re Green Mountain Power, No. 17-2813-PET, 2017 WL 3953962, at *5 (Vt. Pub. Util. Comm'n Aug. 31, 2017) (discussing potential adverse greenhouse-gas emissions as a freestanding factor); In re Vermont Tech. Coll., No. 7965, 2013 WL 1721610, at *13-15 (Vt. Pub. Serv. Bd. Apr. 17, 2013) (same). Because we conclude that in any event the statute does not contemplate that favorable impacts relating to greenhouse-gas emissions might offset adverse aesthetic impacts, we need not address the relationship between the PUC's approach and the structure of the statute.

26

## F. Constitutional Challenges

¶ 65.  Finally, petitioner argues that the PUC's evaluation of §§ 248(b)(1) and 248(b)(5) was "standardless" in violation of its constitutional rights, and that the PUC's application of the "undue adverse impact" and "orderly development" criteria is selective, in violation of the Common Benefits Clause and the due-process protections in the Vermont Constitution.

¶ 66.  With respect to its first argument, petitioner emphasizes the vague and standardless character of the requirement of maintaining the "rural character" of the area.  With respect to its second argument, it contends that other, comparable energy projects have been permitted in the RCD, so the PUC's reliance on the characteristics of the RCD in denying its permit request reflects selective enforcement.  Given our holding above that the PUC erred in relying on the challenged language from the Town Plan involving the rural character of the RCD in its orderly development and aesthetics analyses, we need not reach petitioner's constitutional arguments.

## IV.  Mandate

¶ 67.  Because this decision rejects significant portions of the PUC's rationale for denying petitioner a CPG, we cannot affirm.  Given the difference between Act 250 and § 248, our conclusion that the PUC did not err in concluding that, because it would be prominently visible on a hillside, the project would interfere with orderly development under 30 V.S.A. § 248(b)(1) and would cause an undue adverse impact under 30 V.S.A. § 248(b)(5) is not dispositive as an independent ground to affirm.  The PUC is required only to give "due consideration" to the violation in the context of its orderly development analysis, 30 V.S.A. § 248(b)(1), and is not compelled on account of the design standard to deny the permit as causing an undue adverse impact.  Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 18.  Ultimately, the PUC is charged with determining whether the project will serve the public good.  See UPC Vt. Wind, LLC, 2009 VT 19, ¶ 7 (recognizing that "ultimate question to be resolved" is whether "project promote[s] the general good of the state").  Accordingly, we remand for the PUC to reassess petitioner's

application without the conclusions that siting the facility in the Rural Conservation District would interfere with orderly development and cause an undue adverse aesthetic impact.

Reversed and remanded for additional proceedings consistent with this opinion.

FOR THE COURT:

_____

Associate Justice

¶ 68.   **COHEN, J., dissenting.**   I concur in all aspects of the majority's decision except its conclusion that the Bennington Town Plan's prohibition against new commercial development in the Rural Conservation District that is incompatible with the rural character of the area is not a clear, written community standard. In my view, the Public Utility Commission (PUC) acted within its broad discretion in determining that this is, in fact, an enforceable community standard, with which the proposed project would not comply. I would therefore affirm the decision below.

¶ 69.   I begin by noting the limited nature of our review in this context. When reviewing a petition for a certificate of public good (CPG) under 30 V.S.A. § 248, the PUC "is engaged in a legislative, policy-making process." In re Vt. Elec. Power Co., 2006 VT 69, ¶ 6, 179 Vt. 370, 895 A.2d 226 (quotation omitted). The PUC is tasked with "using its discretion to weigh alternatives presented to it, utilizing its particular expertise and informed judgment." In re Petition of Twenty-Four Vt. Utils., 159 Vt. 339, 357, 618 A.2d 1295, 1306 (1992). "We give great deference to the [PUC]'s expertise and judgment and accord a strong presumption of validity to the [PUC]'s orders." In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 2, 185 Vt. 296, 969 A.2d 144 (quotations omitted).

¶ 70.   As the majority explains, the PUC is required to consider municipal plans in two separate parts of the § 248 analysis. Under § 248(b)(1), the PUC must assess whether the project will unduly interfere with the orderly development of the region, giving due consideration to

28

municipal and regional planning recommendations and town land-conservation measures. Under § 248(b)(5), it must determine whether the project will have an undue adverse effect on aesthetics, historic sites, the natural environment, or public health and safety. An adverse effect on aesthetics is undue if the project will "violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area." In re Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 14, 202 Vt. 59, 147 A.3d 621 (quotation omitted). "Town plans may be sources of clear, written community standards." In re Apple Hill Solar LLC, 2019 VT 64, ¶ 33, 211 Vt. 54, 219 A.3d 1295.

¶ 71. Bennington's 2010 Town Plan was adopted through an extensive public process and is intended to guide future development and growth in Bennington by setting standards for the use of all land area within the Town. The Plan reflects a balance between the need for economic growth and a strong local desire to maintain natural and scenic resources and historic patterns of settlement. To further these goals, the plan promotes concentrated development within the designated "Urban Growth Area." It designates other parts of town, including the Rural Conservation District where the proposed project is to be located, for less concentrated development. The plan specifically states that development outside the Urban Growth Area "shall not include new commercial uses because such uses are incompatible with the rural character of the area." In the Rural Conservation District, which makes up approximately one-third of the Town's land area, "agriculture, forestry, very low density single-family residential development, and certain limited uses that are suitable in rural areas are permitted."

¶ 72. The PUC reasonably interpreted the Town Plan to prohibit new commercial uses in the Rural Conservation District that are incompatible with the rural character of the area. In my view, the PUC correctly determined that this constitutes a clear, written community standard because it designates a specific area of the town where development is restricted and adequately gives notice to potential developers of uses that are not permitted in that location. Although

29

petitioner contends that the term "rural" is too vague to be enforceable, the Plan explains precisely what it means by "rural": agriculture, forestry, and very low-density single-family residential development. As the PUC explained, the proposed project does not fall within any of these limited categories. Instead, the proposed project, if built, would look like an extension of the industrial area to the west and would be out of place among the surrounding farms and forests. The PUC's conclusion is well within its discretion, and we should defer to it.

¶ 73. The majority contends that the cited provisions in Bennington's Town Plan are equivalent to those we declined to enforce in UPC Vermont Wind. In that case, we agreed with the PUC's predecessor that the applicable regional plan did not contain any explicit community standards that would bar a proposed wind project in Sheffield, Vermont. 2009 VT 19, ¶ 38. However, the plan at issue in UPC Vermont Wind was much vaguer than Bennington's Town Plan. Instead of identifying specific areas targeted for preservation, it referred broadly to "rural area districts" which constituted most of Caledonia, Essex, and Orleans Counties and stated simply that development in such areas should be consisted with existing land uses, without identifying specific resources to be protected. Id. Here, by contrast, the Town Plan identifies specific areas for different types of development and sets forth specific requirements and prohibitions for each district. The Rural Conservation District where the project is to be located is limited to "valley areas outside the Urban Growth Area which have retained their rural and open space character," including agricultural land, woodlands, and low-density housing, and constitutes approximately one-third of the town's land area. A map in the Town Plan identifies precisely which parts of town are in the Rural Conservation District. Unlike the regional plan in UPC Vermont Wind, the Bennington Town Plan expressly permits certain types of development in the district—agriculture, forestry, and low-density residential—and prohibits others, i.e., new commercial development that is incompatible with the rural character of the area. These are not the type of "general," "open-ended" statements of preference that we rejected in UPC Vermont Wind. See id. ¶ 38 (explaining

that regional plan's "general statements of preferred, rather than mandated, objectives are far too open-ended to constitute a clear, community written standard that would put [petitioner] on notice that its project was prohibited").

¶ 74.   I am likewise unpersuaded by the majority's reliance on In re Chaves Act 250 Permit Reconsider, 2014 VT 5, 195 Vt. 467, 93 A.3d 69.  The town plan at issue in that case contained only general, aspirational language about maintaining natural and manmade features, protecting valuable areas, and minimizing aesthetic impacts and negative impacts on historic sites within the zoning district where the proposed project was to be located.  Unlike Bennington's Town Plan, it did not contain a specific prohibition against certain types of development within the zoning district where the proposed project was to be located.  The same is true of the town plan provisions we declined to enforce in In re Woodstock Community Trust & Housing Vermont PRD, the other case cited by the majority.  2012 VT 87, 192 Vt. 474, 60 A.3d 686.  The facts of those cases are not sufficiently similar to be controlling here.

¶ 75.   As the majority acknowledges, the § 248 process is quite different from Act 250 review, "where state and local regulatory review coexist."  Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 18.  Under § 248, the Legislature has shifted the balance of power such that the PUC, rather than the municipality, "has the final policy decision" about whether to allow energy projects to be built.  Id.  The PUC acts as the primary guardian of the state's natural resources and scenic beauty in this context.  Its determination that a project does not comply with a local aesthetic standard should therefore be afforded great weight.  Cf. In re Cross Pollination, 2012 VT 29, ¶ 13, 191 Vt. 631, 47 A.3d 1285 (mem.) (explaining that where PUC rationally applied Quechee test in deciding whether project would have undue adverse impact on aesthetics, this Court would defer to that decision).  Here, the PUC correctly determined that the proposed project would not conform with the Town Plan's clear prohibition against new commercial development that is incompatible

31

with the rural character of the area, and we ought to defer to that decision. I therefore respectfully dissent.

¶ 76.    I am authorized to state that Chief Justice Reiber joins this dissent.


                                                 _____

Associate Justice