Dooley, J.
¶ 1. The Town of Rutland (Town) and five adjoining landowners (neighbors) appeal from the Vermont Public Service Board’s grant of a certificate of public good (CPG) under 30 V.S.A. § 248 to Rutland Renewable Energy, LLC (RRE) for construction of the Cold River Solar Project (Project), a 2.3 megawatt (Mw) solar photovoltaic electric generation facility. The Town and neighbors argue that the Board incorrectly held that the project will not unduly interfere with the orderly development of the region, will not have an undue adverse effect on aesthetics, and will not have an undue adverse impact on historic sites. We affirm.
¶ 2. The facts are undisputed. On December 20, 2013, RRE filed a petition requesting a CPG under 30 V.S.A. § 248 to construct and operate a solar electric generation facility of up to 2.3 Mw AC in the Town. The facility would be located southwest of the intersection of Cold River Road and Stratton Road, on approximately 15 acres of a larger parcel of land under contract for purchase by RRE. The parcel is bordered by Cold River Road, “increasing commercial and industrial uses,” a vacant wooded parcel, and four homes. Of the homes, one is separated from the site by a mature hedgerow, one is 150 feet from the project site, one is 280 feet away, and the last is over 500 feet away up a hillside, although it does have a driveway near the site’s southernmost corner. While the parcel is currently an undeveloped open meadow, and the project area does include sections of a Class II wetland and four small Class III wetlands, the parcel is designated as “industrial/commercial” on the Town’s Future Land Use Map. The project would principally include: (1) about 542 solar racks supporting about 10,000 individual panels, although exact wattage, number of panels, and panel configuration will be determined during final design and procurement based on snow and wind analysis; (2) underground electrical lines connecting arrays *62 to combiner boxes and inverters; (3) two 1150 kW inverters with a combined nameplate capacity of up to 2.3 Mw AC; (4) two 1500 kVA step-up transformers or one 2500 kVA step-up transformer; (5) a perimeter fence; and (6) an access area and new curb along Cold River Road to service the northern area, and an extension to an existing access area along the road to service the southern area. The project would have a 64 foot setback from Cold River Road, with the perimeter fence 15 feet nearer to the road.
¶ 3. On March 3, 2014, neighbors and the Town were granted permissive intervention by the Board. The Board appointed a hearing officer to take evidence and render a proposed decision for the Board. The hearing officer took evidence on each of the relevant requirements for issuing a CPG contained in 30 V.S.A. § 248(b). The Town and neighbors particularly contested (1) whether the project met the requirement that it “will not unduly interfere with the orderly development of the region”; (2) whether the project “will not have an undue adverse effect on esthetics”; and (3) whether the project “will not have an undue adverse effect on . . . historic sites.” Id. § 248(b)(1), (5).[1] As discussed in more detail below, the hearing officer found that the proposal met all the requirements of § 248(b) if certain mitigation measures were in place.
¶ 4. The Board accepted most of the hearing officer’s decision and rationale. As we discuss below, the Board somewhat modified the rationale on aesthetics and added a mitigation measure. The Board issued a CPG on March 11, 2015. Neighbors moved for reconsideration on March 26. The Board denied the motion on May 6, 2015, elaborating on its decision with respect to aesthetics. This appeal followed.
*63 ¶ 5. One significant part of the opposition of the Town and neighbors is their reliance on a document entitled Town of Rutland Solar Facility Siting Standards, which were adopted by the Town selectboard on October 22, 2013. The standards were drafted as an amendment to the Town plan. On December 19, the Town Planning Commission proposed an amendment to the Town plan incorporating the standards. The selectboard was expected to adopt the amendment in the summer of 2014.
¶ 6. The standards, as originally adopted by the selectboard, contain a number of provisions that are related to this appeal and are summarized below:
A. The Town desires to contribute its proportional share to meeting the renewable energy goals in Rutland County, as represented by its share of the land area of Rutland County — 2.08% — but “not to exceed that percentage contribution.” The siting standards are intended “to avoid and mitigate potential impacts of solar facility development, while promoting new installations in appropriate locations, and achieving proportionality in Rutland Town’s contribution to renewable energy solutions.”
B. Under General Standards for Energy Projects, the document states that the Town will consider supporting four types of energy development. None of the types include new solar generation facilities. Larger projects must be community-scale “that are designed to meet the expected needs of Rutland Town.”
C. Ground-mounted solar projects of a generation capacity of 1.5 kW or greater “shall be located at least 200 feet from any property line and at least 200 feet from any public highway.” Renewable energy facility setbacks from property lines or occupied structures should be increased as necessary to mitigate identified aesthetics, historic sites, air and water purity, the natural environ *64 ment, the use of natural resources, and the public health and safety, with due consideration having been given to . . . Act 250 criteria . . . and nuisances or adverse impacts upon adjoining property owners.
D. Ground-mounted solar energy facilities shall not be “located on primary agricultural soils.” Such facilities with a generation capacity greater that 100 kW shall “be located on nonagricultural land.”
E. Ground-mounted solar energy facilities “shall not be located within 500 [feet] of a building designated as a historic building.”
It is undisputed that the project does not comply “with the property line, roadway, and historic structure setback requirements contained in the Standards.” The project site contains a variety of primary agricultural soils; the standards prohibit siting a ground-mounted solar facility on primary agricultural soils. The site has not, however, been used for agricultural production for 15 to 20 years.
¶ 7. In its brief to this Court, the Town raises two principal arguments: (1) the Board failed to accord due consideration to the Town’s recommendations that the proposed facility will “unduly interfere with the orderly development of the region” in violation of 30 V.S.A. § 248(b)(1); and (2) the facility will have an “undue adverse impact” on aesthetics, historic sites, and primary agricultural soils in violation of § 248(b)(5). Similarly, neighbors contend that the project will unduly interfere with the region’s orderly development and will have an undue adverse effect on aesthetics and historic sites.
¶ 8. This Court applies a “deferential standard of review in appeals from the Public Service Board.” In re Green Mountain Power Corp., 162 Vt. 378, 380, 648 A.2d 374, 376 (1994). We recognize that:
When the Board evaluates a petition for a CPG under 30 V.S.A. § 248, it is engaging in a legislative, policy-making process. The Board must exercise its discretion to weigh alternatives presented to it, utilizing its particular expertise and informed judgment. We give great deference to *65 the Board’s expertise and judgment and accord a strong presumption of validity to the Board’s orders. We will affirm the Board’s findings unless they are clearly erroneous, and an appellant bears a heavy burden of demonstrating clear error.
In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 2, 185 Vt. 296, 969 A.2d 144 (citations omitted). This is a highly deferential standard of review. Despite the limited standard of review, “we do not abdicate our responsibility to examine a disputed statute independently and ultimately determine its meaning.” In re MacIntyre Fuels, Inc., 2003 VT 59, ¶ 7, 175 Vt. 613, 833 A.2d 829 (mem.).
¶ 9. Under § 248(b)(1), a CPG may be issued for a facility if the Board finds that the facility “will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions . . . [and] the recommendations of the municipal legislative bodies.” The main thrust of the arguments of the Town and neighbors is that the Board failed to give sufficient weight to the standards adopted by the Town legislative body. We emphasize that the statutory requirement relates to the orderly development of the region, not to a particular municipality within the region. Thus, in UPC Vt. Wind, 2009 VT 19, ¶ 20, we affirmed the Board’s analysis of compliance with the requirement based on the overall impact on a three-county region.
¶ 10. We understand that the standard of review to address the Town’s opening argument led to a backlash that persuaded the Legislature to amend § 248 to give towns greater control over solar generation facilities. 2015, No. 56, §§ 26a, 26b, 26c. The new siting requirements in Act 56 were not in place when RRE filed its application or when the Board issued the CPG. They do not purport to be retroactive. Thus, we cannot consider the new requirements or the process that led to their enactment.[2]
*66 ¶ 11. Under this provision of § 248(b)(1), the parties have extensively argued the weight to be assigned to the Town solar facility siting standards, the proper interpretation of the Town plan and the interaction between the plan and the solar facility siting standards, the prohibition on siting on prime agricultural soils in the standards, and the setback requirements in the standards. We do not reach or resolve these arguments.
¶ 12. There was very little evidence of the project’s regional impacts; virtually all the evidence and arguments concerned the impacts on and within the Town. Indeed, the Board found that the “impacts are primarily localized in nature.” It concluded that “while in some instances localized impacts may be found to interfere with orderly regional development due to their character or severity, there is no credible evidence in the record that demonstrates that the localized impacts from this particular project would rise to such a level.” Neighbors respond that the testimony of their expert witness, a landscape architect, was undisputed and showed the requisite regional impact. Essentially, the witness testified that when a project is “incompatible with the land uses in its setting,” it may propagate and have adverse regional impacts, explaining that “no one of those projects will likely have a regional impact, but sprinkling those projects around a town or region without regard to their cumulative impact will certainly have such an impact.” Therefore, aside from the prediction of future replication, there was no actual evidence of regional impact. The Board recited the testimony that no one project is likely to have a regional impact and acted well within its discretion in finding the assertion of regional impact inadequate *67 and not persuasive. We affirm the Board’s conclusion. Because of our resolution of this issue, we do not reach whether the Board gave “due consideration” to the recommendation of the Town as required by § 248(b)(1).
¶ 18. We next turn to the second set of arguments raised by both the Town and neighbors regarding the undue adverse impact of the solar facility upon aesthetics and historic sites. These issues arise under § 248(b)(5), which provides that the Board must find that the project “will not have an undue adverse effect on esthetics . . . [and] historic sites.” We start with aesthetics.
¶ 14. The Board has adopted a modified version of the Quechee test for determining aesthetic impact. The test is named after the decision that first adopted it, In re Quechee Lakes Corp., Nos. 3W0411-EB, 3W0439-EB, slip op. at 19-20 (Vt. Envtl. Bd. Nov. 4, 1985). We have approved the use of the Quechee test by the Board in reviewing a permit for a CPG. See In re Cross Pollination, 2012 VT 29, ¶ 10, 191 Vt. 631, 47 A.3d 1285 (mem.). The test first asks whether the project will have an adverse effect on scenic and natural beauty in the area in which it is located. Id. It is undisputed that the project here has such an effect. It then asks whether the adverse effect is undue. An adverse impact on scenic and natural beauty is not undue if three conditions are met:
First, the project must not violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area. Second, it must not offend the sensibilities of the average person. Finally, the applicant . . . must take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.
Id. (quotations omitted).
¶ 15. The Town and neighbors argue that none of these requirements are met. They rely on the setback requirements contained in the Town of Rutland Solar Facility Siting Standards, which they argue are “a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area.” As to the second condition, the Town and neighbors argue that the Board improperly failed to consider the effect on the sensibilities of the nearby neighbors. Finally, the parties argue that the Board should have considered imposing a smaller setback as a mitigation requirement.
*68 ¶ 16. The Board rejected these arguments, holding that each of the conditions was met and the adverse impact was not undue. With respect to the first element, the Board held that the setback requirements were de facto zoning requirements and could not be considered a community standard because they did not identify an area, and the specific resources in that area, to be protected.
¶ 17. With respect to the first reason, the Board relied upon 24 V.S.A. § 4413(b), which provides that zoning bylaws “shall not regulate public utility power generating plants and transmission facilities regulated under 30 V.S.A. § 248.” Setback requirements are a core component of local zoning. See id. § 4411(a)(3) (zoning may regulate “distances to be left unoccupied by uses and structures”). The Town has not, however, adopted a local zoning ordinance, and the solar siting standards were not adopted as a zoning ordinance. Instead they were adopted as a “supporting plan” under § 4403(5) without the process required for the municipal plan.[3] See id. §§ 4382-4385.
¶ 18. The Board’s holding is a modification of the Queches test because the test was created for Act 250 review, and such review does not generally supplant local zoning regulation. The Town and neighbors argue that the solar siting standards are “clear written community standards” by any definition of those terms. We might adopt that view if we were dealing with Act 250, where state and local regulatory review coexist. Here, we are dealing with a situation where, under existing law, municipalities have a different role. The effect of the solar siting standards under the theory of the Town and neighbors is to enable the Town to control solar generation siting through the Queches test. We agree with the Board that a modification of the Queches test is necessary to give the Board the necessary regulatory power. As the recent amendments to § 248 reflect, the Legislature can change the balance *69 between state and local regulation as it deems appropriate. In the absence of such a statutory change, the Board has the final policy decision. Under the deferential standard of review, we must uphold that policy choice.
¶ 19. We have a similar reaction to the Board’s second rationale — that the community standard element is intended to allow the municipality to identity designated areas and resources that need protection. That was the rationale for the Board’s decision on aesthetics in UPC Vermont Wind, 2009 VT 19, ¶ 26, and we affirmed the Board’s reasoning and conclusion. We similarly affirm it here. The Town never identified the area of this project for special protection to protect aesthetics or scenic beauty. In fact, the municipal plan specified that its future use would be for industrial/commercial development. The site is a low-lying meadow, and the solar panels generally do not interfere with views of surrounding vistas.
¶ 20. We next address the second element: that the project does not offend the sensibilities of the average person. The Board decided that this element was met largely based on the testimony of the expert witnesses. The Town and neighbors argue that the average person for purposes of the test should be put in the position of the close neighbors, and the testimony was that the neighbors’ sensibilities were offended. The Board responded that it had considered the visual impact on neighbors but, generally, the test considered the perspective of an average member of the public. It specifically stated that the Quechee test “require(s) that reasonable consideration be given to the visual impacts on neighboring landowners.”
¶21. We conclude that this issue is controlled by our recent decision in In re VTel Wireless Inc., 2015 VT 135, 201 Vt. 1, 134 A.3d 1227. In that case, neighboring property owners sought to intervene in a CPG proceeding for a communication facility under 30 V.S.A. § 248a, alleging that the project would have an undue adverse effect on aesthetics as viewed from the neighbors’ property. The Board denied intervention, and the neighbors appealed. Although the neighbors argued that the Board improperly found their interest to be irrelevant, we concluded that the Board did consider the neighbors’ interest but did not consider it sufficient to find the adverse impact on aesthetics undue. Id. ¶ 15 (stating that “[rjegardless” of legal relevance of impact on private parties, *70 the landowners’ argument “lacked sufficient weight to raise significant issue” on the merits). We reach a similar conclusion here. In determining whether there has been an undue adverse impact, considering the sensibilities of the average person, the Board can and should consider all vantage points, including from private property. Here, the Board did consider neighbors’ perspective and required extensive screening to mitigate that impact. Under our standard of review, we affirm the decision.
¶ 22. We acknowledge that, in addition to considering neighbors’ interest, the Board ruled that the test definition of an average person meant “the average member of the viewing public who would see a particular project from the vantage point of the public”; that is, while the Board must consider all vantage points, it does so from an objective, as opposed to subjective and neighborly, perspective. The Board did, however, specifically address neighbors’ specific concerns and interests in its mitigation requirement. Thus, the Board stated:
[I]n this case RRE has sought to mitigate the aesthetic impacts of the Project through a vegetative screening proposal. Additionally, as discussed below, in recognition of the unique circumstances of the project, we have taken into account the Project’s visual impacts on the surrounding property owners and have decided to impose some additional mitigation intended to soften those impacts to the extent possible without unreasonably altering the nature of the Project.

The Hearing Officer correctly describes Board precedent that holds that while the aesthetics criterion does not guarantee that views of the landscape will never change, it does require that reasonable consideration be given to the visual impacts on neighboring landowners.
The Board went on to impose mitigation requirements to lessen the impact on a particular neighbor additional to those proposed and one added by the hearing officer. We recognize that the Board has, to a certain extent, merged the second and third conditions to determine whether there is an undue adverse impact under the Quechee test, but our point is that its analysis looked separately at the impact on neighbors. We reiterate that this case *71 has essentially the same posture as VTel Wireless, and we affirm it for the same reason.
¶ 23. Finally, on the matter of aesthetics, we consider the third element of the Queches analysis: whether the applicant has taken generally available mitigation steps. The hearing officer ordered mitigation steps to screen the project from neighbors as proposed by RRE, with several additional measures. The Town and neighbors reargued the need for the full setback as required by the solar facility siting standard as a necessary mitigation measure. The hearing officer found that imposing the setback requirements, including the 500-foot setback requirement required for historic structures, would frustrate the project’s purpose because it would cause a “very significant reduction in the size and capacity of the array.” Before the Board, neighbors argued that the hearing officer failed to consider their alternative request for a setback requirement smaller than that provided in the solar facility siting standards, but greater than the 64 feet proposed by RRE. The Board held that neighbors never proposed an alternative setback requirement. In response to the motion for reconsideration, the Board explained that a witness for neighbors stated “reducing the size of the project should be considered,” but never proposed an alternative setback requirement.
¶ 24. We conclude that the Board’s ruling is well within its discretion, and the neighbors did not offer a fully formed proposal for an alternative setback requirement.
¶ 25. The dissent has raised a new argument on this prong of the Queches test, not raised before the Board. The dissent argues that RRE did not address whether it could mitigate the adverse effect by moving the project to a new site “to improve the harmony of the proposed [project] with its surroundings.” Post, ¶ 55. The dissent notes that neighbors had argued that there were alternative sites in more developed, nonresidential areas of the town. Post, ¶ 54. In making this argument, the dissent argues that In re Halnon, 174 Vt. 514, 811 A.2d 161 (2002) (mem.), holds that an applicant must show that alternative sites that reduce the adverse aesthetic effect are unavailable.
¶ 26. We disagree that Halnon applies here. In that case, the applicant proposed to site a wind turbine in a location on his sixty-two acres of property that was directly within the view of the Green Mountains from a neighbor’s residence. The neighbor argued, and the hearing officer for the Board concluded, that *72 there were better locations on the property for the turbine. Finding that the applicant failed to demonstrate that the alternative locations on the property could not be used to mitigate the adverse aesthetic effect, the Board denied the CPG. We affirmed based on the standard of review. Id. at 518, 811 A.2d at 166.
¶ 27. In this case, the issue is not whether there is an alternative location on the property owned by RRE because the proposal already uses all the available land. The dissent seeks to expand Halnon into a burden to show that there is not a better alternative site anywhere in the town,[4] or at least in any nonresidential area of the town, even though RRE does not own or control the land on which the solar project might be sited. In essence, RRE would be required to show that the proposed site for the solar array is the best site in the town, apparently by systematically evaluating and excluding every other possible site.
¶ 28. The burden the dissent would impose on an applicant is unreasonable, and probably unmeetable. We can find no precedent that suggests that it is part of the Quechee test. Moreover, even if the evaluation of other properties were part of the Quechee test, the initial burden to demonstrate an alternative site is on the opponents, not on the applicant. In In re Goddard College Conditional Use, 2014 VT 124, 198 Vt. 85, 111 A.3d 1285, an Act 250 case, a neighbor argued that the applicant failed to show there were not alternative sites for a woodchip heating plant on its property. The only support for considering any alternative site was the neighbor’s testimony that a representative of the applicant told her that the applicant had considered and rejected two or three other sites. Id. ¶ 12. We held that the testimony was inadequate to meet the neighbor’s initial burden because the “neighbor presented no evidence that, for example, a suitable alternate site is ‘reasonably feasible’ (i.e., it would not frustrate the project’s purpose or Act 250’s goals), or that the alternative *73 satisfies the . . . requirements.”[5] Id. If anything, the very general testimony in support of an alternative site here is even weaker than that in Goddard College Conditional Use. By comparison, in Hainan,, the neighbor identified specific alternative sites on the applicant’s property to which the applicant could move the proposed project, the issue was fully raised and joined before the hearing officer, and the Board denied the CPG. We cannot conclude that neighbors’ argument was properly preserved, but, even if it was preserved, we would reject it. We therefore affirm the Board’s conclusion that the project met the third element of the Quechee test.
¶ 29. Finally, we reject the argument that the project will have an undue adverse impact on historic sites. As with the Quechee test, the Board follows an Act 250 decision from the Vermont Environmental Board, In re Middlebury College, No. 9A0177-EB (Vt. Envtl. Bd. Jan. 26, 1990), to determine whether the project has an undue adverse impact on historic structures. This test has three parts: (1) whether there are historic structures on the site or nearby that are affected by the project; (2) whether the effect is adverse; and (3) whether the adverse effect is undue. In finding no undue adverse effect, the hearing officer relied upon a historic resources expert witness supplied by RRE, as well as a determination by the Vermont Division for Historic Preservation that the project would have no undue adverse impact on nearby historic resources. The neighbors argue that the witness who appeared before the Board spoke only to the public’s ability to interpret or appreciate the historic qualities of the sites and not to the other three conditions that underlie the third element of the Middlebury College test: failure to take generally available mitigating steps to preserve the character of the site, cumulative effects on the historic qualities by various components which together are so significant they create an unacceptable impact, and violation of a clear, written community standard. Because it *74 “is for the Board, not this Court, to weigh the evidence and assess the credibility of witnesses,” UPC Vt. Wind, 2009 VT 19, ¶ 21, we cannot here say that there was inadequate support for the witness’ opinion that the project would not have an undue impact on historical resources. We have addressed above with respect to aesthetics the argument that the solar facility siting standards supplied a written community standard and that the mitigation plan proposed by RRE was inadequate. That analysis also applies here. As to the cumulative effects on the historic qualities of the site, we are convinced by the hearing officer’s and Board’s reliance on the entire record including the independent analysis by the Vermont Division for Historic Preservation.

Affirmed.

 Section 248(b) contains additional requirements, which are not at issue in this appeal. The Town and neighbors also challenged the project because it is partially sited on primary agricultural soils. Section 248(b)(5) requires compliance with many, but not all, of the criteria of Act 250. See 10 V.S.A. § 6086(a)(l)-(9). Criterion 9(B) generally prohibits granting an Act 250 permit if the development will “result in any reduction in the agricultural potential of the primary agricultural soils.” Section 248(b) does not require compliance with criterion 9(B) as part of the CPG process. The Town and neighbors argued that protection of primary agricultural soils was required by § 248(b)(1), which provides that the project must not “unduly interfere with the orderly development of the region.” The hearing officer and the Board addressed that issue. Given our resolution of the § 248(b)(1) question, we do not address the effect of siting the project on primary agricultural soils.

 Act 56 adds requirements in three statutory subsections: 30 V.S.A. § 248(a)(4)(F), id. § 248(b)(1)(B), and id. § 248(s). Section 248(a)(4)(F) provides legislative bodies and planning commissions the right to appear as a party in a § 248 proceeding. The Town legislative body appeared in this proceeding.
Section 248(b)(1)(B) allows municipalities to create screening requirements for ground-mounted solar electric generation facilities and requires the Board to impose them unless it finds “that requiring such compliance would prohibit or have the effect of prohibiting the installation of such facility or have the effect of *66 interfering with the facility’s intended functional use.” Although the adequacy of screening is an issue in this case, the Town has not created screening requirements.
Section 248(s) sets minimum setback requirements for ground-mounted solar electric generation facilities. Although there has been no adjudication of whether the project here would meet those setback requirements, it appears that it would not meet the minimum setback from a town highway of 100 feet, but would meet the minimum setback from other properties of 50 feet. See 30 V.S.A. § 248(s)(1), (3). The subsection contains no separate setback requirement for historic sites. Thus, the fact that the Town siting standards impose a separate setback requirement from a historic building is not reflected in the statute. The subsection does authorize the Board to impose a larger setback requirement, but there is no suggestion that the Board lacks the power to impose a setback requirement under the preexisting law.

 The municipal plan is made up, in part, of component plans. Id. § 4382(a). It is unclear whether the component plans are the supporting plans referenced in § 4403(5). In addressing the effect of the siting standards, the hearing officer to the Board concluded that the supporting plans were separate documents and were not required to be incorporated into the municipal plan. Under this theory, there is no specific statutory process for creation of a supporting plan. We note, however, that the term “supporting plan” necessarily means that this plan cannot be inconsistent with the municipal plan. The Board found an inconsistency, and we agree. Presumably, this is why the Town was in the process of incorporating the siting standards in the municipal plan.

 The dissent does not say that the alternatives evaluated would have to be in the town, and there is no logical reason, other than the cost and extent of the burden in complying, why town boundaries would control the inquiry. We note that the Town has tried through its solar siting standards to designate where solar generation projects should not be sited, but has not specified where in the Town, if any, they should be sited. In fact, as the summary in ¶ 6, supra, shows, at least part of the Town’s intent appears to be to exclude large solar projects.

 In Hainan, we assumed that meeting the mitigation requirement could involve relocation of the wind turbine on the applicant’s property without examining the issue. In Goddard College Conditional Use, we explicitly declined to rule “whether alternative siting within a project tract may be considered as a reasonable mitigating measure (as opposed to a whole different project not subject to consideration in an Act 250 permitting proceeding).” 2014 VT 124, ¶ 11. We consider the question still open even in the narrow circumstances presented in those cases.