NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 63

No. 25-AP-005

| | |
|---|---|
| In re Petition of Randolph Davis Solar LLC (Joan Allen and Michael Binder, Appellants) | Supreme Court |
| | On Appeal from Public Utility Commission |
| | September Term, 2025 |

Edward McNamara, Chair

Joan Allen and Michael Binder, Pro Se, Randolph Center, Appellants.

Kimberly K. Hayden of Paul Frank + Collins P.C., Burlington, for Appellee Randolph Davis Solar LLC.

Caroline Daniels, Special Counsel, Montpelier, for Appellee Vermont Department of Public Service.

PRESENT: Reiber, C.J., Eaton, Cohen and Waples, JJ., and Corsones, Supr. J., Specially Assigned

¶ 1. **REIBER, C.J.** Neighbors Joan Allen and Michael Binder appeal the Public Utility Commission's (PUC) grant of a certificate of public good (CPG) to applicant Randolph Davis Solar LLC to construct a solar-energy project in Randolph, Vermont. Neighbors argue the PUC erroneously concluded the project: (A) would comply with 30 V.S.A. § 248(b)(1)'s orderly development criteria; (B) would not cause unreasonable soil erosion under 30 V.S.A. § 248(b)(5); and (C) qualified as a "preferred site" by misapplying PUC Rule 5.103. We conclude that the PUC did not err in granting applicant a CPG and therefore affirm.

## I. Legal Framework

¶ 2.     Some background on the legal framework is helpful to understand the issues on appeal.  A company must apply for and obtain a CPG from the PUC before it may build an electric-generation facility.  30 V.S.A. § 248(a)(2).  To grant a CPG, the PUC must find that the facility satisfies the criteria contained within § 248(b).  These criteria include, as relevant here, the PUC's determinations that the proposed project will not interfere with the affected region's orderly development or have undue adverse impacts.  Id. § 248(b)(1)-(5).

¶ 3.     Under § 248(b)(1)'s orderly development criterion, the PUC must give due consideration to the "recommendations of the municipal and regional planning commissions . . . municipal legislative bodies, and the land conservation measures contained in the plan of any affected municipality."  Id. § 248(b)(1).  If an affected region's or town's plan has "received an affirmative determination of energy compliance under 24 V.S.A. § 4352,"[1] the PUC must give that plan's land-conservation measures "substantial deference."  Id. § 248(b)(1)(C).  Without an affirmative determination, the PUC must only give such measures due consideration.  In re Acorn Energy Solar 2, LLC, 2021 VT 3, ¶ 92, 214 Vt. 73, 251 A.3d 899 (rejecting argument PUC had to determine if project complied with town plan because it only had to consider such compliance under § 248(b)(1)).

¶ 4.     Section 248(b)(5) requires that the project "will not have an undue adverse effect on aesthetics, historic sites, air and water purity, the natural environment, the use of natural resources, and the public health and safety" after the PUC gives due consideration to criteria within

---

[1]  A regional plan receives an affirmative determination of energy compliance only after the regional planning commission submits it to the Commissioner of the Department of Public Service, who then determines whether the regional plan satisfies certain statutory criteria.  24 V.S.A. § 4352.  If a regional plan receives this determination, a municipal legislative body within the region may submit its town plan to the regional planning commission.  Id.  Then, the regional planning commission may issue an affirmative determination of energy compliance to the town plan if it is both consistent with the regional plan and the statutory criteria within 24 V.S.A. § 4352(c).

10 V.S.A. §§ 1424a(d) and 6086(a)(1) through (8) and (9)(K). 30 V.S.A. § 248(b)(5). One of the relevant criteria incorporated from 10 V.S.A. § 6086(a) is that the project must "not cause unreasonable soil erosion or reduction in the capacity of the land to hold water so that a dangerous or unhealthy condition may result." 10 V.S.A. § 6086(a)(4).

¶ 5. Finally, the PUC's rules require net-metered systems with capacities ranging from 150 to 500 kW to be built on "preferred sites." Construction and Operation of Net Metering Systems § 5.103, Code of Vt. Rules 30 000 5100 [hereinafter Rule 5.100], http://www.lexisnexis .com/hottopics/codeofvtrules. Rule 5.103 was amended to give towns more flexibility in designating specific locations as preferred sites. Vt. Pub. Util. Comm'n, Report to the Vermont General Assembly on the Net-Metering Program Pursuant to Act 99 of 2014, at 20-21 (Jan. 20, 2017), https://legislature.vermont.gov/Documents/2018/WorkGroups/House%20Energy%20 and%20Technology/New%20Net%20Metering%20Proposed%20Rules/W~Sarah%20 Hofmann~Net%20Metering%20-%20Final%20Report~1-31-2017.pdf [https://perma.cc/E558-MCH4] (explaining town's ability to designate preferred site beyond time-consuming town-plan process). Accordingly, preferred sites include specific locations that a municipal legislative body and municipal and regional planning commissions jointly determine are suitable for solar-facility development consistent with their respective plans. Rule 5.100 § 5.103(7).

## II. Background

¶ 6. In August 2021, applicant applied for a CPG from the PUC to construct a 500 kW solar-energy project in Randolph, Vermont. Portions of the project's infrastructure, such as its access road and interconnection line, will be located on land that exceeds a 25% slope.

¶ 7. In June 2021, the Two Rivers-Ottauquechee Regional Commission (TRORC), the Town of Randolph Planning Commission, and the Town of Randolph Selectboard executed a joint letter in support of the project and expressed a desire for the PUC to designate the project site as a

3

"preferred site" under Rule 5.103.[2] In October that same year, neighbors alerted the Town that the project's initial design conflicted with the Town Plan because it would have been located on slopes exceeding a 25% grade. Because of this noncompliance, neighbors requested the Town rescind the preferred-site letter. Shortly after, neighbors filed a motion to intervene that was granted.

¶ 8. The Town agreed with neighbors that some of the panels in the array appeared to be located on slopes exceeding 25%. In its December 2021 letter, the Town conditioned its continued support on no panels being built on slopes exceeding 25% and on the final site plan being provided to the Town and neighbors. Applicant later modified its initial project plan to remove the panels from slopes greater than 25% and assured the Town a survey would be conducted to confirm no panels would be installed on such slopes.

¶ 9. Applicant created six site plans using different survey methods. In June 2023, the hearing officer asserted that it was unclear whether the Town's conditions were sufficiently satisfied to designate the project site as "preferred" under Rule 5.103. The hearing officer perceived a "lack of mutual understanding" between applicant and the Town as to what method of measurement should be used for the site plan's survey data. The hearing officer noted that the measurement method could affect the average slope, and therefore whether panels would be on slopes exceeding a 25% grade.[3] The hearing officer reasoned this uncertainty was inconsistent

---

[2] While the initial preferred-site letter is dated June 2020, the record shows the letter was not issued until June 2021.

[3] As the hearing officer explained, the measurement method used to collect survey data affects the average slope because it controls horizontal resolution. More measurements taken create a smaller resolution with more detailed slope information. Conversely, fewer measurements create a larger resolution with less detail because the slope is averaged between measurement points. Applicant prepared its initial site plan using LiDAR survey data, which results in a smaller horizontal resolution. Applicant then supplemented this data with "on-the-ground" survey data measured by applicant's surveyor, who plotted seventy-six points to measure an area of four acres. While applicant did not provide the PUC with a map of this on-the-ground survey data or its ultimate horizontal resolution, the hearing officer suggested it would likely take about 1800 points for this on-the-ground survey data to achieve a horizontal resolution similar to LiDAR's.

with Rule 5.103's purpose and requirements. Therefore, the hearing officer issued a proposal for decision recommending the PUC deny applicant's CPG petition.

¶ 10. In October 2023, the PUC rejected that proposal for decision and remanded the case. It rejected the hearing officer's concerns about the methods of measurement and refocused the inquiry on whether the Town, rather than the PUC, was satisfied that the Town's conditions were met. The PUC reasoned that "[a]bsent extraordinary circumstances" it "[would] not second-guess a municipal determination that a site is preferred." Thus, on remand, the PUC ordered applicant to submit evidence demonstrating the Town's conditions had been met. Applicant complied by submitting a January 2024 letter from the Town wherein the Town confirmed its conditions were satisfied.

¶ 11. In its final order, the PUC accepted the letter as proof that the Town's conditions were satisfied. Therefore, the PUC determined the Town's preferred-site letter was valid for Rule 5.103 purposes indicating continued support.

¶ 12. The PUC's final order also concluded that the project would not unduly interfere with the region's orderly development as required by § 248(b)(1). It found the project would not have a regional impact because all impacts would be localized or otherwise controlled by the Agency of Natural Resources' (ANR) regulations.

¶ 13. Furthermore, ANR authorized applicant to discharge stormwater during construction under ANR's General Permit 3-9020 (Permit), which is the general permit for low-risk sites. A permittee must comply with the Vermont Standards and Specifications for Erosion Prevention and Sediment Control (EPSC) and the Low Risk Site Handbook for Erosion Prevention and Sediment Control (Low-Risk Handbook), which contain practices to prevent undue soil erosion depending on slope grade. Stormwater Permitting Rule § 22-502(d), Code of Vt. Rules 12 030 22, http://www.lexisnexis.com/hottopics/codeofvtrules (authorizing permit conditions incorporating erosion and sediment control programs by reference); see, e.g., Agency of Nat. Res.

5

Dep't of Env't Conservation, General Permit 3-9020 for Stormwater Runoff from Construction Sites, https://dec.vermont.gov/sites/dec/files/documents/3-9020_Stormwater_ConstructionGeneralPermit_2020-02-19.pdf [https://perma.cc/F4VM-VB35]. ANR conducted a risk evaluation of the proposed project site and acknowledged that development would occur on slopes greater than 25%. Ultimately, ANR determined applicant's compliance with the Permit would extend sufficient stormwater control based on ANR's risk evaluation of the project site.

¶ 14.   In its final order, the PUC noted that applicant's compliance with the EPSC measures and the Low-Risk Handbook would prevent unreasonable soil erosion under 30 V.S.A. § 248(b)(5). Neighbors presented no contrary evidence that applicant's compliance with the aforementioned measures would be insufficient to prevent soil erosion. Therefore, the PUC found these measures and those required by the Permit would present sufficient stormwater control for the project.

¶ 15.   In August 2024, after considering the evidence before it, the PUC granted applicant's request for a CPG. Neighbors filed a motion to reconsider, which the PUC denied. Neighbors timely appealed.

## III.  Analysis

¶ 16.   This Court has previously noted the "limited nature of our review" for challenges to a CPG grant. In re Vt. Elec. Power Co., 2006 VT 69, ¶ 6, 179 Vt. 370, 895 A.2d 226. We give "great deference to [the PUC's] expertise and judgment and accord a strong presumption of validity to [its] orders." Id. (quotations omitted); see also In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 2, 185 Vt. 296, 969 A.2d 144 (explaining that when PUC evaluates CPG application, it engages in "a legislative, policy-making process" (quotation omitted)). "We defer to the PUC as factfinder, and we do not reweigh the evidence on appeal." In re Apple Hill Solar LLC (Apple Hill II), 2021 VT 69, ¶ 53, 215 Vt. 523, 280 A.3d 44. "We will affirm the PUC's findings unless they are clearly erroneous and its legal conclusions if they are rationally derived from a correct interpretation of

the law and supported by the findings." In re Apple Hill Solar LLC (Apple Hill I), 2019 VT 64, ¶ 27, 211 Vt. 54, 219 A.3d 1295 (quotations omitted). Finally, we will "give great weight to how the PUC applies its own rules." In re Green Mountain Power Corp., 2018 VT 97, ¶ 17, 208 Vt. 349, 198 A.3d 36 (quotation omitted).

¶ 17. On appeal, neighbors argue the PUC made "material errors of law" and "acted arbitrarily and capriciously" by granting a CPG to applicant. Specifically, neighbors claim the PUC made three errors by finding the project: (A) would comply with § 248(b)(1) orderly development criteria; (B) would not cause unreasonable soil erosion as required by 10 V.S.A. § 6086(a)(4); and (C) was a "preferred site" by misapplying Rule 5.103. We address each of these arguments in turn below.

## A. Orderly Development

¶ 18. Neighbors first argue that the PUC did not afford "due consideration," to the town plan's land-conservation measures as required by 30 V.S.A. § 248(b)(1), in concluding that the project would not unduly interfere with the region's orderly development. Generally, when "construing a statute, our principal goal is to effectuate the intent of the Legislature." State v. LeBlanc, 171 Vt. 88, 91, 759 A.2d 991, 993 (2000) (quotation omitted). We begin with the statutory language and "assume the Legislature intended the plain and ordinary meaning of the language it used." State v. Ettore, 2024 VT 52, ¶ 13, __ Vt. __, 327 A.3d 773 (citing LeBlanc, 171 Vt. at 91, 759 A.2d at 993). If ambiguity exists after considering the language's plain meaning, we turn to other canons of statutory construction. Flint v. Dep't of Labor, 2017 VT 89, ¶ 5, 205 Vt. 558, 177 A.3d 1080.

¶ 19. The Legislature has not defined "due consideration" under § 248(b)(1). We have previously rejected arguments suggesting "due consideration" requires the PUC to find that a proposed project "strictly adher[es]" to regional or town plans prior to issuing a CPG. UPC Vt. Wind, LLC, 2009 VT 19, ¶ 17 (rejecting argument that PUC was required to find project adhered

7

to regional plan because statute's plain terms only required PUC to give it "due consideration"); see also Apple Hill II, 2021 VT 69, ¶ 31 (distinguishing Act 250's "prerequisite" permitting, which requires compliance with plan's land-conservation measures, from § 248, which entitles such measures "only to 'due consideration' "). Instead, we have said "due consideration" regarding land-conservation measures within a town plan functionally guide—not necessarily govern—whether these criteria are satisfied. Vt. Elec. Power Co., 2006 VT 69, ¶ 25.

¶ 20. The current due-consideration standard derives from our decision in City of South Burlington v. Vermont Electric Power Co., 133 Vt. 438, 344 A.2d 19 (1975). That case involved the construction of an electrical-transmission line to the Burlington area—an "undisputed" and "urgent" need. Id. at 440, 344 A.2d at 20. At issue was whether the PUC required a zoning permit from South Burlington before construction could proceed.[4] This Court "recognize[d] and approve[d]" the public-policy statement articulated by the Connecticut Supreme Court: that "municipalities should play a secondary role where a clash of authority appears to exist between state control and local control of a public utility furnishing a state-wide service." Id. at 446-47, 344 A.2d at 24 (citing Jennings v. Conn. Light & Power Co., 103 A.2d 535 (Conn. 1954)). Additionally, we indicated that § 248's requirement that municipalities' recommendations are afforded "due consideration" "at least impliedly postulates that municipal enactments, in the specific area, are advisory rather than controlling." Id. at 447, 344 A.2d at 25. To hold otherwise, we reasoned, would have the effect of precluding the transmission line's construction entirely because South Burlington's ordinances did not allow for it. Id. at 447-48, 344 A.2d at 25. Accordingly, this Court indicated we cannot "give[] single municipalities the power to subvert utility projects statewide in scope and broadly entrusted to a single planning and supervisory agency." Id. at 448, 344 A.2d at 25.

---

[4] The Public Service Board (PSB) referenced in the case is the predecessor to the PUC. See, e.g., Acorn Energy Solar 2, LLC, 2021 VT 3, ¶ 71 (explaining that PSB was "the predecessor to the PUC").

¶ 21.    Later, we relied on City of South Burlington to articulate preemption principles. See, e.g., In re Patch, 140 Vt. 158, 177, 437 A.2d 121, 130 (1981) (citing City of South Burlington in declining to apply preemption doctrine to case facts because doctrine should be invoked "when the local law is a barrier to what the state has required to be done").  And we eventually invoked City of South Burlington as our current treatment of the due-consideration standard materialized. See, e.g., Vt. Elec. Power Co., 2006 VT 69, ¶¶ 25, 27 (noting that we construed phrase "due consideration" in City of South Burlington and concluding that PSB decision "effectively address[ed] the Shelburne town plan"); see also UPC Vt. Wind, LLC, 2009 VT 19, ¶ 17 (citing "due consideration" construction in City of South Burlington in dismissing argument that PUC was required to find project "strictly adhered" to regional plan because PUC "need only give" planning recommendations "due consideration").

¶ 22.    The Legislature amended § 248 in response to concerns about the lack of control municipalities faced in the solar-siting process.  See, e.g., In re Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 10, 202 Vt. 59, 147 A.3d 621 (citing 2015, No. 56, §§ 26a, 26b, 26c) (explaining Legislature amended § 248 in 2015 to "give towns greater control over solar generation facilities"). However, despite these amendments, the Legislature has not defined due consideration or added language suggesting the PUC should defer to municipal land-conservation measures under the "due consideration" standard beyond what our precedent requires.

¶ 23.    For this reason, we follow the existing legal framework before us.  That framework requires the PUC to consider compliance with the provisions of a town plan "to the extent they qualify as land conservation measures or screening requirements of a municipal ordinance or bylaw" when determining § 248(b)(1)'s orderly development requirement.  Acorn Energy Solar 2, LLC, 2021 VT 3, ¶ 92.  This application of the standard therefore does not necessarily require we accede to a town or regional plan's land-conservation measures.  Apple Hill II, 2021 VT 69, ¶ 31 ("[E]ven a clear, written land-conservation measure . . . does not present an insurmountable

9

obstacle to approval . . . ."); UPC Vt. Wind, LLC, 2009 VT 19, ¶ 17 ("[PUC] need only give 'due consideration' to the recommendations of the municipal and regional planning commissions in deciding if the project 'will not unduly interfere with the orderly development of the region.' " (quoting 30 V.S.A. § 248(b)(1))).

¶ 24.    Here, the Regional Plan has attained an affirmative determination of energy compliance.  The Town Plan has not.  Thus, the Town Plan is entitled to "due consideration" of its land-conservation measures.  Apple Hill II, 2021 VT 69, ¶ 31.  The PUC determined that the energy-development prohibition on slopes exceeding 25% was a land-conservation measure.  But it acknowledged noncompliance was not a decisive factor in the orderly development analysis. The PUC considered the measure, noting the project's localized impact, and concluded the project would not unduly interfere with the orderly development of the region.

¶ 25.    Neighbors argue "due consideration" requires the PUC to construe noncompliance with a plan's land-conservation measures as a determinative element of the inquiry under § 248(b)(1).  To do otherwise, neighbors claim, would render the phrase "due consideration" superfluous.  See Baldauf v. Vt. State Treasurer, 2021 VT 29, ¶ 19, 215 Vt. 18, 255 A.3d 731 (explaining that we avoid construing statutes in manner that renders part of statutory language superfluous).  Neighbors urge this Court to adopt the definition of due consideration from Hoyt v. Smith, which defined "due consideration" to require "consideration in proper course of procedure." 83 Vt. 412, 415, 76 A. 107, 107 (1910).

¶ 26.    But Hoyt involved a different issue than is present here.  In Hoyt, a Washington County justice of the peace signed a writ in a civil action for trespass and assault and battery that was made returnable to the Caledonia County court.  The defendant moved to dismiss the suit, arguing the Washington County justice of the peace had no authority in Caledonia County.  The plaintiff moved to amend the writ to state it was signed in Caledonia.  The plaintiff's motion to amend was granted, and the defendant's motion to dismiss was denied.  On appeal we said that the

"defect was one of form" and that the words in the writ "upon consideration" meant "upon <u>due</u> consideration" which required "consideration in proper course of procedure." <u>Id</u>. at 414-15, 76 A. at 107-08.

¶ 27. Neighbors urge that <u>Hoyt</u>'s definition of "upon due consideration," centers on process and procedure. They argue the same applies here such that the PUC must "duly consider[]" and give "the weight of contemplative inclusion" to a plan's land-conservation measures.

¶ 28. We are not persuaded by neighbors' comparison to <u>Hoyt</u> and decline to adopt neighbors' definition of due consideration. <u>Hoyt</u> primarily applies in the context of amendments to judicial process errors, not to the consideration of local land-conservation measures in the CPG process, as disputed here. See, e.g., <u>Elwell v. Olin</u>, 99 Vt. 460, 462, 134 A. 592, 593 (1926) (citing <u>Hoyt</u> to support proposition that amendment is allowed where defect in process still confers jurisdiction).

¶ 29. Neighbors next claim that the PUC's orderly development finding was not supported by the evidence. Neighbors rely on PUC Rule 5.107(C)(8), which established an applicant's CPG filing requirements. Construction and Operation of Net-Metering Systems § 5.100, Code of Vt. Rules 30 000 5100, https://puc.vermont.gov/sites/psbnew/files/doc_library/ 5100-PUC-nm-effective-07-01-2017_0.pdf [https://perma.cc/T6JU-R63X]. While Rule 5.107(C)(8) is now rescinded, it was in effect at the time of filing, and "we apply the substantive law in effect at that time."[5] <u>Apple Hill II</u>, 2021 VT 69, ¶ 30 n.3. Rule 5.107(C)(8), in relevant part, required an applicant to file copies of relevant sections from town and regional plans along with testimony describing how a project "complies with or is inconsistent with" land-conservation measures contained therein. <u>Id</u>.

---

[5] Rule 5.107 has since been removed from the PUC's Rule 5.100. Compare Rule § 5.100 (describing current rule and noting Rule 5.107's removal), with Construction and Operation of Net Metering Systems § 5.100, Code of Vt. Rules 30 000 5100, [https://perma.cc/T6JU-R63X] (describing Rule 5.107 as effective beginning in 2017).

¶ 30. In August 2021, applicant submitted a report to assist the PUC's aesthetics and orderly development analyses. The Report included citations to and quotations from relevant provisions of the Town and Regional plans. It emphasized the project's compatibility with the Town and Regional Plans' respective policies and goals. It further cited the existence of the joint preferred-siting designation to bolster its assertion that the project would not unduly interfere with the orderly development of the region.

¶ 31. On appeal, neighbors challenge the Report's sufficiency and rely on two main points. Neighbors claim that, in addition to the Report, applicant should have: (1) submitted a copy of the Regional Plan's suitability map to demonstrate the project was not prohibited by the Regional Plan; and (2) disclosed in the Report that the project did not comply with the Town's prohibition on energy development on slopes exceeding 25%. Applicant's failure to do so, neighbors allege, resulted in a lack of evidence making the PUC's orderly development finding baseless and in error.

¶ 32. We will not disturb the PUC's findings of fact unless clearly erroneous. Vt. Elec. Power Co., 2006 VT 69, ¶ 6; In re Adelphia Bus. Sols. of Vt., Inc., 2004 VT 82, ¶ 7, 177 Vt. 136, 861 A.2d 1078 ("The burden of demonstrating clear error is the appellant's, and that burden is not a light one."). The PUC's findings are clearly erroneous only if the record does not support them. In re TruConnect Commc'ns, Inc., 2021 VT 70, ¶¶ 19-20, 215 Vt. 422, 263 A.3d 770 (demonstrating we uphold findings when supported by record and because finding had no record support, we "can only conclude" finding was clearly erroneous).

¶ 33. Here, the PUC had sufficient evidence before it to make findings on orderly development. Applicant's failure to provide the PUC with copies of the Town and Regional Plans did not deprive the PUC of evidence upon which to base its orderly development determination. As discussed above, the Report included excerpts from the Town and Regional Plans and described the project's compliance with their respective prohibitions. The PUC based its findings on the

evidence applicant presented. While the PUC did not make explicit findings regarding the Regional Plan suitability map, this does not amount to clear error. Its findings reflect that it had sufficient evidence before it to make an orderly development determination.

¶ 34. Finally, neighbors argue that the PUC acted arbitrarily and capriciously in determining the project complied with § 248(b)(1)'s orderly development requirement because of the project's regional impacts. If a regional impact is established, it may prevent a project only if it unduly interferes with the region's orderly development. UPC Vt. Wind, LLC, 2009 VT 19, ¶ 20 (explaining even if project has substantial regional impact "it does not necessarily follow that the project therefore will unduly interfere with the orderly development of the region").

¶ 35. According to neighbors, the record contains "ample evidence" the project would unduly interfere with the region's orderly development. First, neighbors argue the project would have a regional impact because of its location within a surface-water protection area. Neighbors assert the Regional Plan's definition of "substantial regional impact" includes development that threatens public water supply. Neighbors reason even if the impacts are "localized and confined to the project site," an undue adverse regional impact will still result. Second, neighbors claim the project's potential soil erosion will have a regional impact because of the alleged increased risk of natural disasters like flooding.

¶ 36. The PUC considered and rejected both of neighbors' claims. It weighed the project's potential impacts on "floodways, streams, wetlands, and soil erosion." The PUC recognized ANR's stormwater Permit contained measures to prevent soil erosion. It ultimately concluded that neighbors' concerns did not give rise to a regional impact.

¶ 37. On appeal, neighbors essentially urge this Court to reweigh the evidence in the record to overturn the PUC's findings. This we will not do. See UPC Vt. Wind, LLC, 2009 VT 19, ¶ 21 (declining to reconsider evidence, which falls under PUC's purview, and reach opposite conclusion to PUC); see also Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 29 ("[I]t is for the

13

[PUC], not this Court, to weigh the evidence and assess the credibility of witnesses . . . ." (quotation omitted)). The PUC has weighed the evidence before it, and it acted within its discretion in doing so. Accordingly, we affirm the PUC's determination that the project will not unduly interfere with the region's orderly development.

## B.  Soil Erosion and Water Pollution

¶ 38.    Neighbors next argue that the PUC erred in finding the project would not cause soil erosion or water pollution under 30 V.S.A. § 248(b)(5) and 10 V.S.A. § 6086(a)(1)(4).  First, neighbors allege that the PUC conflated ANR's grant of applicant's construction stormwater Permit with § 248(b)(5) compliance.  Second, they claim the PUC erred in deferring to ANR's interpretation of "impervious surface."  Third, neighbors challenge the PUC's characterization of ANR's arguments as evidence when, according to neighbors, ANR submitted no evidence.

¶ 39.    First, we address neighbors' argument that the PUC conflated ANR's grant of the Permit with statutory compliance.  While ANR is the primary agency tasked with creating stormwater-management regulations, it is not the only state agency entrusted with protecting water.  See, e.g., 6 V.S.A. § 4810(d) (charging Agency of Agriculture, Food and Markets with implementing practices consistent with "water pollution control requirements of 10 V.S.A. chapter 47 and the federal Clean Water Act").  Neighbors raise that the Land Use Review Board (LURB) is tasked with Act 250 compliance and makes findings independent of ANR.  Neighbors contend that the PUC's primary reliance on ANR's Permit was in error because the Legislature incorporated the 10 V.S.A. § 6086 criteria in 30 V.S.A. § 248(b)(5), and therefore the PUC should have been required to make independent, site-specific findings similarly to the LURB.

¶ 40.    We have previously recognized "tests imported from Act 250 may apply differently in the § 248 context."  Apple Hill II, 2021 VT 69, ¶ 41.  Contrary to neighbors' argument, Act 250 permit compliance is entrusted to both the LURB and ANR.  See 10 V.S.A. § 8004 (providing Act 250 enforcement is joint venture of LURB and ANR); In re N.E. Materials Grp., LLC, 2017 VT

14

43, ¶ 6, 205 Vt. 490, 174 A.3d 747 (stating Act 250 gives LURB and ANR enforcement power for Act 250 permits).[6] Neighbors acknowledge that the PUC considered more than ANR's Permit, but they take issue with what they view as the PUC's near-exclusive reliance on the Permit. However, as referenced above, the PUC considered more than the Permit. This Court will not "reweigh the evidence on appeal." Apple Hill II, 2021 VT 69, ¶ 53. Neighbors' disagreement with the PUC's findings on soil erosion when it weighed the evidence presented does not amount to clear error.

¶ 41. Neighbors also contend the PUC was required to address the risk of post-construction erosion because the Permit only governs stormwater discharge during construction. But the PUC expressly considered that the Low-Risk Handbook requires measures to control permanent, or post-construction, stormwater discharge. Based on ANR's regulations and Permit, and applicant's assurances that it would comply with the Low-Risk Handbook, the PUC made an informed finding on soil erosion for § 6086(a)(4) purposes. We see no error.

¶ 42. Next neighbors claim that the PUC erred in deferring to ANR's interpretation of "impervious surface" when determining whether the project would cause soil erosion or water pollution. A facility is required to secure an additional, operational stormwater permit from ANR if its development would result in at least one-half acre of impervious surfaces. 10 V.S.A. § 1264(c)(1). Impervious surfaces are defined as "manmade surfaces, including paved and unpaved roads, parking areas, roofs, driveways, and walkways, from which precipitation runs off rather than infiltrates." Id. § 1264(b)(6). The Legislature tasked ANR with implementing § 1264 through stormwater-management rules. Id. § 1264(a)(2)(B), (f). We defer to ANR's interpretation if the terms are within its expertise, if ANR applies complex methodologies to define them, or if

---

[6] The Natural Resources Board is now called the LURB. In re SM Farms Shop, LLC, 2025 VT 33, ¶ 6 n.1, __ Vt. __, 342 A.3d 862 ("The Natural Resources Board is now called the Land Use Review Board.").

ANR is "statutorily authorized to provide such guidance." In re Korrow Real Est., LLC Act 250 Permit Amend. Application, 2018 VT 39, ¶ 20, 207 Vt. 274, 187 A.3d 1125. However, this deference is not absolute. See, e.g., In re Woodford Packers, Inc., 2003 VT 60, ¶ 17, 175 Vt. 579, 830 A.2d 100 (mem.) (stating ANR's authority may give rise to due-process violation if "arbitrarily and capriciously applied").

¶ 43. ANR explained that it measures impervious surfaces for solar panels based on the panel's base or foundation—material that directly touches the ground. Elevated panel surfaces are not considered impervious for this calculation because precipitation comes off the panel's surface and contacts the vegetated ground beneath. In its order denying neighbors' motion for reconsideration, the PUC accepted and followed ANR's formula for calculating the project's impervious surface area. The PUC stated that after considering the evidence presented by neighbors and ANR, it was persuaded by ANR's determination and saw no reason to reconsider its conclusion.

¶ 44. Neighbors assert that because solar panels are manmade surfaces, the panel's surface should also count when measuring impervious surfaces for ANR stormwater permitting. They argue the PUC erred in deferring to ANR's interpretation of the term "impervious surface" as applied to solar panels.

¶ 45. We disagree. The PUC did not err when it accepted ANR's formula for measuring an elevated solar panel's impervious surface. ANR's interpretation of the term "impervious surface" as applied to elevated solar panels is wholly consistent with its statutory authority under § 1264. Moreover, ANR possesses the relevant expertise to craft the formula for measuring an elevated solar panel's impervious surface. By restricting an elevated solar panel's measured area to the area that covers the ground, ANR applied the same logic that defines impervious surfaces in § 1264(b)(6). "[P]aved and unpaved roads, parking areas, roofs, driveways, and walkways" all share a common characteristic: they prevent precipitation from percolating to vegetation

16

immediately beneath them. Only the base of an elevated solar panel will function in the same way. The elevated panel itself may only delay, rather than block, precipitation from reaching the ground beneath.

¶ 46. Finally, neighbors challenge the PUC's characterization of ANR's arguments as evidence when, according to neighbors., ANR submitted no evidence. This is contrary to the record before us. The hearing officer requested "ANR explain whether and how Vermont's stormwater management regulations and the Project's design will address [neighbors'] concerns." ANR responded to the request through a post-hearing legal briefing. Along with this, ANR requested that the PUC to take notice of judicially cognizable facts contained within three documents attached to its briefing. 3 V.S.A. § 810(4) (providing agency may take notice of judicially cognizable facts). These three attachments were: applicant's notice of intent under the Permit, applicant's site plan map, and the Low-Risk Handbook. There were no objections to ANR's request for the PUC to take judicial notice of these documents. Therefore, the hearing officer granted ANR's request.

¶ 47. Neighbors claim the evidence submitted was not responsive to the hearing officer's request. The PUC concluded otherwise. Neighbors' disagreement with the PUC on the responsiveness of ANR's filing is not a basis for clear error.

### C. Preferred-Site Determination

¶ 48. Finally, neighbors argue that the PUC misapplied its own rule, Rule 5.103. After the Town was put on notice from neighbors, it communicated with applicant and conditioned its preferred-site letter on compliance with two requirements: (1) that no panels would be on slopes with a grade greater than 25%; and (2) that the final site plan would be provided to both the Town and neighbors. As noted above, the hearing officer initially recommended that the PUC deny applicant's petition for a CPG because of the lack of mutual understanding as to the method of measurement used for the site plan's survey data. The PUC rejected this recommendation,

17

required applicant to submit evidence demonstrating the Town's conditions were satisfied, and directed the hearing officer to address the remaining § 248 criteria. Despite applicant's submission of the Town's January 2024 letter, neighbors continued to challenge applicant's method of measurement, alleging it was inaccurate and misleading.

¶ 49. We disagree. The PUC correctly found that the Town's conditions were met based on its January 2024 letter. The PUC did not err when it interpreted and applied Rule 5.103. Like other agencies, our deference extends to the PUC's reasonable interpretations of its own rules and regulations. In re Conservation L. Found., 2018 VT 42, ¶ 15, 207 Vt. 309, 188 A.3d 667 (stating our deference extends to PUC's interpretations of its own regulations). This deference is not "mere judicial passivity in determining the propriety of [the PUC's] interpretations of its own rules." In re Vitale, 151 Vt. 580, 583, 563 A.2d 613, 615 (1989) (quotation omitted). Instead, "[w]e still conduct an independent review and will overturn an agency's interpretation of its own promulgated regulation that exceeds" the agency's statutory authority; conflicts with the agency's prior interpretations of the same rule; results in "unjust, unreasonable or absurd consequences"; or "demonstrates compelling indications of error." Conservation L. Found., 2018 VT 42, ¶ 16 (quotations omitted).

¶ 50. While the PUC may be better suited to interpret survey data, it is not in a better position to second-guess a municipality's decision as to whether a specific location would qualify as a preferred site. The Town was aware of neighbors' arguments regarding the accuracy of different measurement methods. With these arguments in mind, it could have required applicant to produce a site plan that contained certain measurement methods, like LiDAR, to satisfy its condition. But it did not. Instead, the Town only requested it be provided with survey data. We do not agree with neighbors that the site plan provided to Town was obsolete. Creating site plans may be an iterative process, but it is not necessarily a sequential one. The Town did not require a

18

version of the site plan that built upon the sixth; it only required the final one applicant intended to implement.

¶ 51. We also reject neighbors' argument that the PUC impermissibly placed the burden on the Town, instead of applicant, to demonstrate its conditions were satisfied. The Town did not intervene, and it was not required to. In its remand order, the PUC squarely placed the burden on applicant to produce evidence "demonstrating that the Town . . . [was] satisfied" that the conditions in its December 2021 letter were met. Applicant's evidence came from the Town itself via its January 2024 letter. The Town set the conditions for its support. The Town was in the best position to determine whether its conditions were satisfied or not.

¶ 52. Because we reject neighbors' arguments, we affirm the PUC's final order finding the project site was a preferred site under Rule 5.103. The PUC may accept the Town's assurance that its conditions were satisfied as consistent with Rule 5.103(7)'s intent to give municipalities more flexibility in siting preferred sites.

IV. Conclusion

¶ 53. We reject neighbors' arguments and affirm the PUC's rationale for granting applicant a CPG. The PUC made findings for each of the § 248 criteria and resolved "the ultimate question . . . whether the project promoted the general good of the state." UPC Vt. Wind, LLC, 2009 VT 19, ¶ 7. The PUC's findings were not clearly erroneous, and its legal conclusions were "rationally derived from a correct interpretation of the law and supported by the findings." Apple Hill I, 2019 VT 64, ¶ 27 (quotation omitted). The PUC properly exercised its discretion, and we see no basis to disturb its conclusion that applicant is entitled to a CPG.

Affirmed.

FOR THE COURT:

_____
Chief Justice

19